Nos. 42,750 and 42,882

LEWIS A. PAUL, *Appellant,* v. FRANK W. NORTH, *Defendant,* and L. CHANDLER SMITH, *Appellee.*

(380 P. 2d 421)

Opinion filed April 6, 1963.

*Gerrit H. Wormhoudt,* of Wichita, argued the cause, and *Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Willard B. Thompson* and *David W. Buxton,* all of Wichita, were with him on the brief for the appellant. *Hugo T. Wedell* and *Homer V. Gooing,* both of Wichita, of counsel.

*Oscar S. Brewer,* of Kansas City, Missouri, argued the cause, and *W. A. Kahrs,* of Wichita, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action designed to impress a constructive trust upon the assets of the Chandler Investment Company, a corporation, (or upon its stock) formerly owned by the Western Control Corporation, Inc. It is alleged the assets or stocks of the Chandler Investment Company were in the hands of, or subject to the control of, Frank W. North and L. Chandler Smith (defendants-appellees).

Upon joinder of issues the action was tried to the court against L. Chandler Smith alone, resulting in a judgment in favor of the defendant. Appeal has been duly perfected from this judgment (No. 42,750), and the orders of the trial court overruling post-trial motions (No. 42,882).

The primary question to be determined on appeal is whether the evidence supports the findings and judgment of the trial court.

The appellant contends the trial court drew erroneous conclusions of law from the undisputed facts.

The facts material to this appeal may be summarized as follows:

James House, Robert Kolde and their wives were the owners of Western Control Corporation, Inc., located in Wichita, Kansas. House and Kolde were willing to sell the business. In the month of July, 1959, Lewis A. Paul (plaintiff-appellant), a resident of Wichita, commenced a series of discussions with House concerning the proposed sale of the Western Control Corporation, Inc. to him. Four different proposals were made by Paul to House during July and August, 1959. The first two proposals were options in favor of Paul. The last two proposals were in the form of sales contracts running from the corporation and its stockholders to Paul. All of these proposals were in writing and were prepared by Paul's attorneys. None of these proposals, however, was ever executed by the Western Control Corporation or by any of its stockholders.

The fourth and last of Paul's proposals was a sales contract which embodied the terms upon which House and Kolde were willing to sell. This contract provided that the total purchase price was to be $500,000, payable $200,000 in cash and $300,000 in credit, to be represented by two notes to the sellers for $150,-000 each. The notes were to be secured by first mortgages on all of the land, plant and equipment of the Western Control Corporation. Paul's testimony was to the effect that House agreed to sign the contract if Paul could raise the money to make the payments called for in the contract, and if Paul could also raise an additional $150,000 needed for working capital to operate the business. House testified, however, that during all of his discussions with Paul he was engaged in similar discussions with other prospective buyers, both in Wichita and outside of Wichita, Kansas. House stated "it is not correct that we had an agreement, no sir. I was at the time willing to deal with anybody."

Paul did not have the necessary funds to implement his proposal to House, so he enlisted the aid of various stock brokers in Wichita and Kansas City to find a financial angel. Paul contacted Frank North, a Kansas City broker, and informed North that he had an option to purchase the assets of Western Control Corporation, Inc. for $500,000; that $150,000 in additional working capital would be needed which he could obtain in the form of a line of bank credit; that the purchase would require a cash payment of $200,000; and that the sellers would carry bank mortgages for $300,000. Paul stated that he and a friend could put up $100,000, and he wanted

"the other $100,000.00 to be raised either by selling stock or getting the funds from an individual or a group of individuals."

Paul submitted to North numerous papers, financial statements, and certain projections showing the future financial possibilities of the corporation. North made contact with a prospective purchaser in Kansas City and arranged a meeting between Paul and this prospect, a Mr. Perry. However, Perry decided not to go through with the proposition. North then made contact with L. Chandler Smith (defendant-appellee) and told him of Paul's proposition, and he showed Smith the figures that Paul had prepared.

The first meeting between Paul and Smith took place in Wichita on September 16, 1959. At this meeting Paul represented to Smith that he had an option to buy the assets of the corporation for $500,-000, and that an additional $150,000 was needed as working capital; that Paul and Guy Shelley could put up $100,000, and that if Smith would put up $100,000, the remaining $450,000 could be raised by a first mortgage loan of $300,000 by the sellers and a working capital loan of $150,000 from certain Wichita firms where Paul had a line of credit.

Smith expressed doubt that any bank would loan a new enterprise $150,000, when all of its assets would be subject to prior first mortgages to the seller for $300,000. Paul then proposed that Smith contribute the entire additional sum of $250,000 required to complete the down payment, and to provide working capital. He also proposed that the stock of the purchasing corporation be originally issued to the parties in proportion to their initial capital contributions, 72% to Smith and 28% to Paul and Guy Shelley. Paul also asked that Smith give him a ten-year option to purchase 22% of the stock originally issued at the option price of $150,000.

Paul also proposed to Smith that he be given a ten-year management contract at a salary of $35,000 per year. Paul told Smith that the owners of the corporation had previously offered him a job to manage the business for them, and that he could manage it.

Smith told Paul that he would not commit himself to any deal with him until he had investigated the business, and had investigated Paul and Guy Shelley. Smith then went to the plant of Western Control Corporation, Inc. and inspected the business for the first time, and returned to Kansas City.

On the 22nd day of September, 1959, Smith returned to Wichita, and the parties again met. Paul testified that on this date he re-

iterated his offer and Smith agreed to go into the deal on Paul's terms. Smith denied that he made any answer to Paul's offer at that time. Paul's wife was present at this meeting, but her testimony did not corroborate that of her husband, and the trial court did not see fit to give credence to Paul's testimony on this point.

On the 23rd day of September, 1959, Smith conferred with the officers and owners of the Western Control Corporation, Inc. and was told by House that Paul had no option to buy the business; that House and Kolde were willing to sell the business to any qualified buyer who would meet their price; that they were negotiating with other prospective buyers; that they would not consent to a loan of $300,000 to the purchasing corporation, unless Smith would personally guarantee its payment; that they had never offered Paul a job to manage the Western Control Corporation, Inc.; and that the value of their assets had increased by about $50,000 since House had first talked to Paul in August, 1959.

On the 26th day of September, 1959, the parties met again. Smith told Paul what his investigations had disclosed; that he was unwilling to guarantee Paul a ten-year management contract at $35,000 a year; that he was unwilling to pledge his personal credit for $300,000 and put a disproportionate amount of cash into the business for the purpose of financing a ten-year stock option for Paul. Smith then offered Paul and Guy Shelley the opportunity to participate in the purchase to the extent of their cash contribution. In other words, if Paul and Guy Shelley put in $100,000 and Smith put in $250,000, Paul and his associate would get 28% of the stock. Paul told Smith that he would have to consult with his attorneys about the matter. Smith then told Paul that he would try to complete the purchase of the business without Paul, if Paul chose not to go into the deal on the basis of the counter proposal.

Paul called Smith on the 28th day of September, 1959, and rejected Smith's counter proposal and insisted that Smith accept his proposal. The parties met for the last time on the 30th day of September, 1959, at which time each one reiterated his previous position.

Thereafter, Smith organized the Chandler Investment Company, and on the 7th day of October, 1959, this newly organized corporation entered into a contract with Western Control Corporation, Inc. to purchase the assets of the latter. Under the terms of this contract the purchase price was $552,600, and Smith was obligated to

and did personally guarantee the payment of $300,000 extended in credit.

The information upon which the Chandler Investment Company acted in purchasing the business was a combination of the data volunteered to Smith by Paul's agent, North, the Kansas City broker, and by Paul, and information supplied to Smith by Western Control Corporation, Inc. and its stockholders. Smith also made his own financial projections and analyses and had an appraisal of the assets made by an independent company with the consent of the seller. All of the information in the hands of Paul was freely available from the selling corporation to any prospective purchasers, and much of it had been published annually by the seller in Dun and Bradstreet.

The foregoing facts are in substance the findings of the trial court, and they are fully supported by the evidence in the record.

In addition to the foregoing, the trial court found that Paul's demand for a ten-year management contract at a salary of $35,000 per year was an essential part of Paul's proposal to Smith; and that in making the purchase of the Western Control Corporation, Inc., Smith was obligated, upon demand of the sellers, to personally guarantee the payment of $300,000 extended in credit to the purchasing corporation.

The 28% interest in the business offered to Paul and his associate, Guy Shelley, for $100,000, which Paul refused to purchase, was sold to Mr. Kemper for the sum of $105,000, without any stock option and without any management contract going to Kemper.

The trial court found the business of the Western Control Corporation was for sale, and the figures which Paul's agent, North, gave to Smith were given to North by Paul and to Smith by North with no contractual restrictions whatsoever upon their dissemination or use. In concluding its findings the trial court said:

". . . Plaintiff sought to tie prospective purchasers to plaintiff not by contractual restrictions upon the dissemination or use of this information but by representing that plaintiff had an option to purchase the business."

The trial court concluded (1) that no fiduciary relationship was created between Paul and Smith; (2) that no joint adventure between Paul and Smith was established by the evidence; (3) that Paul was not entitled to specific performance; (4) that the evidence was insufficient for the imposition of a constructive trust in favor of Paul; and (5) that no wrong or breach of legal duty

was committed by Smith for which Paul could seek equity. It thereupon entered judgment for Smith.

In the verified allegations of the petition commencing this action Paul alleged that Smith had actually agreed to his proposals and had entered into a contract for a joint adventure with him. In his prayer Paul requested specific enforcement of such contract. This was the theory upon which the case was tried in the lower court.

After hearing conflicting evidence on this point the trial court found against Paul (appellant). On appeal this theory has been abandoned by the appellant.

Having met with failure on the first point, the appellant contends *his proposal* that he and Smith buy the property as co-adventurers created a fiduciary relationship which prevented Smith (appellee) from acting on his own behalf to the exclusion of the appellant. The appellant takes the position that when he furnished confidential information to the appellee to be used for their joint benefit, the appellee was precluded from using it for his individual benefit.

By reason of the foregoing the appellant states the only question presented by this appeal to be as follows:

"Can one to whom a purchase opportunity is disclosed in conjunction with a proposal of joint participation in the purchase accept the information and appropriate the purchase opportunity for his exclusive benefit and upon his own terms?"

To support his position the appellant relies on *Goodrich v. Wilson,* 106 Kan. 452, 188 Pac. 225; and *Ballard v. Claude Drilling Co.,* 149 Kan. 506, 88 P. 2d 1021, contending the latter is directly in point. We make specific reference to these cases and, without an extended review herein, simply call attention to the fact that these cases were based upon *agreements* between the parties, and a constructive trust was sought to restore the fruits of those agreements. In each of these cases, *Ballard* and *Goodrich,* the trial court had sustained a demurrer to the plaintiff's petition, from which order appeal was perfected to this court. The petition in each instance specifically alleged an agreement, and it was held on appeal that a cause of action was stated on the theory of constructive trust. Further discussion of the instant case will reveal other distinctions.

It has been recognized that a fiduciary relationship between parties does not depend upon some technical relation created by,

or defined in, law. It exists in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard for the interests of the one reposing the confidence. (*Lindholm v. Nelson,* 125 Kan. 223, 264 Pac. 50, Syl. ¶ 3; and *Howell v. Cooperative Refinery Ass'n,* 176 Kan. 572, 576, 271 P. 2d 271.)

Fiduciary relationships recognized and enforceable in equity do not depend upon nomenclature; nor are they necessarily the product of any particular legal relationship. (*Grannell v. Wakefield,* 172 Kan. 685, 242 P. 2d 1075; and *Lindholm v. Nelson,* supra.) They may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties. (*Grannell v. Wakefield,* supra; and *Yeager v. Graham,* 150 Kan. 411, 94 P. 2d 317.) But they necessarily spring from an attitude of trust and confidence and are based upon some form of agreement, either expressed or implied, from which it can be said the minds have met in a manner to create mutual obligations. (*Shoemake v. Davis,* 146 Kan. 909, 73 P. 2d 1043; Pomeroy's Equity Jurisprudence, Vol. 3, § 902; and *Appleman v. Kansas-Nebraska Natural Gas Company* [U. S. C. A. 10th Cir. 1954] 217 F. 2d 843.)

For the plainest of reasons, agreements establishing fiduciary relationships, if not in writing, must be clear and convincing. Because of the acuteness of the equitable remedies, courts will not reach out to establish legal relationships from which enforceable equitable rights may flow. A confidential relationship is never presumed, and the burden of proof is upon the party asserting it. (*Yeager v. Graham,* supra; *Grannell v. Wakefield,* supra; and *Appleman v. Kansas-Nebraska Natural Gas Company,* supra.)

Mere concert of action, without more, does not establish a fiduciary relationship. (*Grannell v. Wakefield,* supra; and *Yeager v. Graham,* supra.) Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises. (*Appleman v. Kansas-Nebraska Natural Gas Company,* supra.)

Obviously, the appellant did not convince the trial court that a fiduciary relationship was established between the appellant and the appellee, because it found the appellant sought to tie prospective purchasers of the Western Control Corporation to him, not by

contractual restrictions upon the dissemination or use of the information which he had, but by representing that the appellant had an option to purchase the business.

This point is emphasized in the record by the testimony of House as follows:

"Q. Did you ever make any agreement with Mr. Lewis Paul as indicated by the first paragraph of that letter [written by Paul] to sell him this corporation under the contract as stated?

"A. No, sir.

"Q. Now in these various conferences you had with Mr. Paul which terminated with his going to his home or his office and writing up some memorandum and returning it back to you, will you state to the Court why you rejected those various contracts that he continued to bring to you?

"A. Well there were several reasons. Basically perhaps the most important reason in one form or another they would have constituted an option and he would be appointed as exclusive agent. That was one reason, and the next reason, perhaps equally important, was that there was no money apparent to me to implement these things. It was a theoretical proposal, each one of them being if I did this or that and get this much money together at some future date you will sell me this Corporation. I couldn't do that. The assets of the Corporation, we were proposing to sell fixed assets and keep the liquid assets. Every month or every week the liquid assets changed. We would buy a piece of machinery and it would become a fixed asset and the cost of fixed assets increased and there was no basis on which we could say that somewhere in the future the price would be such and so and I was not about to enter into any such option agreement.

"Q. As I understand, in all your negotiations with Mr. Paul you are telling the Court that you never at any time gave him an option, either oral or in writing, to purchase your Company?

"A. No sir I certainly did not.

"Q. Did you ever appoint him your agent to sell the property?

"A. No sir I did not. As this thing progressed it became increasingly apparent to me that this man's connections that were going to furnish this money were nonexistent and what was apparently happening was that Mr. Paul was going out as a kind of broker making various proffers and we were getting some publicity that was doing us real damage. It was getting back to our employees that the business was for sale and they were all wondering what was going on and it was hurting us and as this thing progressed finally I had to tell Lew that we had to stop this thing; if he couldn't deliver this money and get the thing buttoned up we would just have to forget it, and as a result of the publicity I began to be approached by other individuals and as a matter of fact I was dealing with perhaps three or four or five individuals toward the end of these negotiations and I furnished them with the figures and the balance sheets and the profit and loss and I was by that time ready to sell to any qualified individual or group of individuals that would come up with the money and the credit rating and the ability to run the Company and I didn't particularly care whether it was Mr. Smith or this guy or that guy or the other guy.

"Q. Did you furnish Mr. Paul your balance sheets and other information in connection with your firm?

"A. Yes, sir.

"Q. Did you likewise furnish that information to other prospective buyers?

"A. Yes, sir, I furnished it to several other people.

"Q. Was there anything confidential about the information you gave Mr. Paul?

"A. It was rather hardly confidential. As a matter of fact it was in the Dun and Bradstreet reports, a lot of it for five years, and you could hardly call it confidential."

Assuming, without conceding, that a fiduciary relationship arose between the parties by reason of their negotiations concerning the purchase of Western Control Corporation, the appellant's own conduct was not consistent with such relationship. Where such relationship exists fair dealing requires that the parties be frank with each other. It demands the utmost good faith in all the dealings of the parties with each other. If the appellee had fiduciary obligations toward the appellant, the appellant in turn had fiduciary obligations toward the appellee. A contractural or fiduciary duty cannot be predicated upon false representations. (*Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 252 P. 2d 1074; *Lassen v. Marland Production Co.*, 133 Kan. 313, 299 Pac. 947; and *Westerman v. Corder*, 86 Kan. 239, 119 Pac. 868.)

Here the appellant represented to the appellee that he had an option to purchase the business; that the option price was $500,-000; that he had a line of credit of $150,000 from Wichita banks; and that the appellant's managerial capacity was such that he had been offered a management position by the owners of the business sought to be purchased. All of these statements were false. (See, *Ohio Oil Co. v. Sharp* [10th C. C. A. 1943] 135 F. 2d 303.)

The appellant seeks to circumvent these statements by contending that they are not material to a determination of the issue in this case. Appellant's counsel argue that appellant was using the word "option" as a layman would use the term, and not in its legal sense. In the face of the record this argument cannot be asserted because the appellant repeatedly attempted to get a written option to purchase Western Control Corporation on the basis of proposals prepared by his attorneys, and such proposals were consistently rejected.

Whether the appellant had an option to purchase Western Control Corporation and the terms upon which it could be purchased were vitally material in this case. It was not until the 23rd day

of September, 1959, that the appellee learned the representations made to him by the appellant were false. The appellee then learned for the first time that the sellers would not consent to a loan of $300,000 to the purchasing corporation, unless the appellee would personally guarantee its payments.

At this point it became apparent the appellant was asking for an option from the appellee which, according to the appellant's testimony, would return the appellant a clear profit of $190,000 for which he was to pay nothing, and thus the entire risk of loss for the extra $150,000, which appellee was asked to put into the deal, was to be on the appellee. In addition, the appellant's proposal was that he should receive a contract to manage the business for ten years for a salary of $35,000 per year. The trial court found this management contract was an essential part of the appellant's proposal.

We think the record may fairly be interpreted to support the trial court's conclusion that all dealings between the appellant and the appellee were at arm's length—that no fiduciary obligation was created between them, and that no joint adventure was established.

After the appellee learned the truth about the whole matter, he told the appellant what his investigation had disclosed. He told the appellant he was unwilling to guarantee the appellant a ten-year management contract for a salary of $35,000 a year, and was further unwilling to pledge his personal credit for $300,000 and put a disproportionate amount of cash in the business to finance an option for 22% of the stock for the appellant at the appellee's risk.

At this conference the appellee made an honest disclosure to the appellant of his intentions. On the 26th day of September, 1959, the appellee offered to include the appellant and Guy Shelley in the enterprise to the extent of their actual contributions in relationship to the actual contribution that was to be made by the appellee. The appellee then told the appellant if he and Shelley did not wish to participate in the deal on this basis, he would go ahead and try to put the deal together without them.

From the 26th day of September until the 7th day of October, the appellant and Guy Shelley had as much opportunity as the appellee to deal with the owners of Western Control Corporation. Both appellant and appellee were free to negotiate and acquire the property for their own accounts without infringement of any

prior relationship. Equity will not decree a double standard and appellee was just as free to deal for his own benefit as was the appellant. Each party was dealing for his own benefit and neither was in a fiduciary relationship. (*Harris v. Morse* [D. C., S. D. N. Y. 1931] 54 F. 2d 109; and *Beckett v. Pierce* [1946] 157 Fla. 184, 25 So. 2d 486.)

The foregoing full disclosure by the appellee to the appellant negatives the charge of fraud or double dealing on the part of the appellee. (*Beckett v. Pierce,* supra.)

The counter proposals of the appellant and the appellee did not create a joint adventure between them. A joint adventure must be based upon some form of agreement. (*Curtis v. Hanna,* 143 Kan. 186, 53 P. 2d 795.)

Even if there had been a joint adventure between the parties to this appeal relative to the acquisition of Western Control Corporation on the basis of appellant's proposal to the appellee, and a fiduciary relationship stemming from it, such relationship would have ended when the appellant's plan of acquisition failed. The appellee was thereafter free to negotiate and acquire the business without infringement of any prior relationship to the appellant.

We have no Kansas cases similar to the instant case on the facts. Two cases in the United States have been decided upon similar facts where the legal theories propounded by the plaintiffs have been identical to those propounded by the appellant herein. They are *Appleman v. Kansas-Nebraska Natural Gas Company,* supra, decided by the Circuit Court of Appeals for the Tenth Circuit on the basis of Kansas law; and *Beckett v. Pierce,* supra, a Florida case decided in 1946.

Both parties rely upon the *Appleman* case. On the facts there, the district court gave judgment for the defendants and concluded that no fiduciary relationship was ever established. The Court of Appeals affirmed the district court and held that the relationship between the parties, whatever it may have been, terminated with the plan of acquisition when it failed. Rules of law applicable to the instant case were there set out in the opinion citing Kansas cases. The parties there agreed upon a tentative plan for the purchase of properties, and the interest each would have upon the consummation of the plan. But the agreement was subject to and contingent upon various factors, one essential condition being

dependent upon financing from the bank and insurance company. In the opinion the court said:

"But the arrangement whereby they would acquire the properties did not contemplate a joint ownership and a sharing of the profits in the sense that they would be partners or joint adventurers. It clearly contemplated that each would acquire a separate and distinct interest in the properties, after which the joint enterprise would come to an end. It follows, therefore, that the relationship between the parties, whatever it may have been, terminated with the failure of the plan of acquisition, and the parties were thereafter under no mutual obligation with respect thereto. . . ." (p. 849.)

Kansas-Nebraska later entered into negotiations with Fin-Ker which resulted in the purchase of the property. In the acquisition of the properties the parties acted upon information, some of which was assembled during the prior negotiations. They dealt with the same parties, secured finances from the same sources, and obstacles formerly insurmountable were easily overcome in the new approach. Upon these facts and circumstances the court said in the *Appleman* opinion:

". . . But under the findings of the court, which we credit, we do not have a situation in which one co-adventurer connives behind the back of another to acquire the subject property of the venture, as in Dexter & Carpenter, Inc., v. Houston, 4 Cir., 20 F. 2d 647, and Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A. L. R. 929. Nor do we have an unfaithful trustee of confidential information as in Ohio Oil Co. v. Sharp, 10 Cir., 135 F. 2d 303, and Ballard v. Claude Drilling Co., 149 Kan. 506, 88 P. 2d 1021. Information upon which Kansas-Nebraska acted was neither confidential nor the property of either Appleman or Kansas-Nebraska individually or both of them jointly.

"With a clean break between the negotiations that failed and those that succeeded, each of the parties was free to negotiate and to acquire the property for his own account without infringement of any prior relationship. . . ." (p. 850.)

In *Beckett v. Pierce,* supra, the facts are similar to the instant case. The plaintiff sought to impress a trust upon corporate stock and to have himself declared the owner of a one-third interest. The plaintiff alleged that he participated in a joint venture with the defendants to buy stock of the Piggly-Wiggly Corporation, and that as a result thereof a fiduciary relationship between the parties arose. Later the defendant purchased the stock without the plaintiff. The evidence showed that the plaintiff solicited the aid of the defendants to finance the venture; that the plaintiff fully disclosed all information he had as to price and projected profits to the defendants; that the plan of purchase was rejected by the

selling corporation; that thereafter the defendants offered the plaintiff a chance to buy his share of the stock on an equal basis; and upon rejection by the plaintiff the defendants bought the stock themselves.

The Florida court held a joint venture was not established by the proof, but even assuming a joint venture was present, when the selling corporation declined the parties' plan to buy, the project ended then and there. Further, after the plan of acquisition was rejected, the defendants' disclosure to the plaintiff, and offer to let him purchase stock, did not substantiate the charge that the defendants conspired to defraud the plaintiff of any interest in the venture.

In the instant case the appellant's plan of acquisition failed. That plan was to buy the business for $500,000. The business could not be bought for that—it cost $52,600 more. Just as the deal in *Beckett v. Pierce* needed the infusion of the defendants' cash, which plaintiff there had not planned, the deal in this case not only departed from the appellant's plan in the matter of price, but it also needed the infusion of appellee's personal credit to the extent of $300,000. Just as in the *Beckett* case, the appellee in this case offered the appellant stock in the changed deal at appellee's cost.

The appellant's third contention sounds in tort. The appellant claims that he was the exclusive owner of the knowledge that the business was for sale and the financial data concerning the business—that it was a species of property—and such knowledge had been wrongfully appropriated by the appellee. In his petition he alleged:

". . . It was further understood by plaintiff and House and Kolde that the contemplated sale should be kept confidential and divulged only to the extent necessary to procure such additional capital for plaintiff. . . ."

The trial court found this allegation in the appellant's petition was false, and that House and Kolde were willing to sell the business to any qualified buyer who would meet their price, and were in fact negotiating with prospective buyers other than the appellant. It further found that all of the information in the hands of the appellant was in the public domain, and was freely available from sellers to any prospective purchaser. It had been made available to other prospective purchasers by House, and much of it had been published annually by the sellers in Dun and Bradstreet.

This information was not confidential, and information of this type is not "property" which is capable of being owned by anyone.

The appellant gave this information to his agent, North, when he employed North to find a financial angel, and there were no restrictions imposed upon the agent as to whom he was to give the information.

Cases holding that promotional ideas and plans are not property are *Appleman v. Kansas-Nebraska Natural Gas Company,* supra; and *Haskins v. Ryan* [1906] 71 N. J. Eq. 575, 64 Atl. 436, aff'd per curiam 75 N. J. Eq. 623, 73 Atl. 1118.

In 73 C. J. S., Property, § 2, the following rule is stated:

". . . the general rule is that a person has no property right in an idea that is not novel, not subject to copyright, or not patentable. However, the courts recognize that there may be property in an idea, business suggestion, trade secret, process or formula, or system, but only if the proprietor or originator protects it from escape or disclosure by contract, express or implied, prior to voluntary disclosure. . . ." (p. 153.)

In support of the foregoing statement, see *Bristol v. E. L. A. Society* [1892] 132 N. Y. 264, 30 N. E. 506; and *O'Brien v. RKO Radio Pictures* [D. C., S. D. N. Y. 1946] 68 F. Supp. 13.

The appellant argues that the information possessed by the appellant was worth $15,000 as evidenced by the payment of this sum by the purchasing corporation to Barret, Fitch, North & Company in the month of December, 1959. The payment of this sum by the purchasing corporation to North was admitted by the testimony of the appellee.

Contrary to the appellant's contention, the record does not disclose this sum was paid by the purchasing corporation to North for simply advising the appellee of what the appellant had said about the opportunity. The record discloses that when North first called the appellee in Kansas City on the telephone to inform him of the fact that the business in the instant case was for sale, the appellee replied that he was about to get in touch with him because he was looking for a new investment.

In view of this testimony and the general finding of the trial court favorable to the appellee, it must be assumed this payment was a finder's fee to North. Whether North was engaged in double dealing is not a matter about which we are concerned on this appeal.

The judgment of the lower court is affirmed.