**BANK IV SALINA, N.A., as Conservator for the Estate of Michael Ray Russ, Plaintiff,**

v.

**The AETNA CASUALTY & SURETY CO., Defendant.**

No. 91–4246–R.

United States District Court, D. Kansas.

Dec. 18, 1992.

Gerald W. Scott, Wichita, KS, Mickey W. Mosier, Lawton M. Nuss, Clark, Mize & Linville, Chtd., Salina, KS, for plaintiff.

Keith U. Martin, Payne & Jones, Chtd., Overland Park, KS, Ronald D. Heck, Cynthia J. Sheppeard, Heck & Sheppeard, P.A., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a diversity action brought by plaintiff Bank IV Salina, as conservator for the Estate of Michael Ray Russ, a minor, for breach of a settlement agreement and misrepresentation. The defendant is The Aetna Casualty & Surety Company. This matter is presently before the court upon Aetna's motion to dismiss or, in the alternative, for summary judgment.

In the instant motion, defendant essentially argues that plaintiff has failed to state claims upon which relief can be granted. In doing so, the defendant has relied upon matters outside the pleadings. Accordingly, we find that the motion should be construed as one for summary judgment.[1]  Fed.R.Civ.P. 12(b); *Torres v. First State Bank of Sierra County,* 550 F.2d 1255, 1257 (10th Cir.1977).

1. In response to defendant's motion, plaintiff has acknowledged that the motion should be considered as one for summary judgment. Plaintiff has further noted that no discovery has been undertaken and has suggested, citing Fed. R.Civ.P. 56(f), that some discovery may be necessary "before the court can consider the application of judgment." Despite the reference to Rule 56(f), plaintiff has failed to comply with its requirements. Plaintiff has failed in any of its affidavits to indicate that he is unable to present facts by affidavit that are essential to justify its opposition to the defendant's motion. Accordingly, the court shall proceed to decide the defendant's motion based upon the materials before the court.

In considering the defendant's motion for summary judgment, the court must examine all the evidence in the light most favorable to the plaintiff. *Barber v. General Electric Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir.1981). Summary judgment is proper only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this rule, the initial burden is on the moving party to show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party's burden may be met when that party identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553.

Once the moving party has met these requirements, the burden shifts to the party resisting the motion. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The party resisting the motion "may not rest upon the mere allegations or denials of his pleadings ..." to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Id.* at 251, 106 S.Ct. at 2511 (quoting *Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

Although discovery has not as yet been undertaken in this case, most of the facts are not in dispute. On or about February 3, 1989, Michael Ray Russ, who was then four years old, was traveling in an automobile with his natural mother, Lacene Hall, from Kansas to Texas. Michael Ray was the only passenger in the car. Lacene and Michael Ray were relocating to Texas. Lacene had two other children, Christina Gardenhire and Linda Hall, and a husband, Alfred Hall. Each of her children had a different father. Lacene had a flat tire while driving that night on I–35 near Perry, Oklahoma. After parking on the shoulder, she refused a ride for help from a passing motorist. Although informed that the motorist would call for a tow truck, Lacene grew impatient waiting and drove back into the right-hand lane of I–35. The flat tire limited the car's speed to approximately 10 to 15 miles per hour. The car was subsequently struck by a truck driven by Anthony Bruce Rogers. Sometime after the impact, the car caught on fire. Lacene died from her injuries at the scene. Michael Ray suffered severe burns over the majority of his body. It was later discovered that Lacene's blood alcohol content at the time of the accident was .13%.

Rogers, the driver of the truck, was employed by Jack Hood Transportation, Inc., whose liability carrier was Aetna. Aetna's policy with Jack Hood Transportation, Inc. had a coverage limit of $1,000,000.00 per accident.

In November 1989, Michael Russ, Michael Ray's father, brought suit against Aetna, Rogers, Jack Hood Transportation, and Hood's News Agency, Inc., in the District Court of Saline County, Kansas. The suit sought damages for Michael Ray's personal injuries arising from the February 3, 1989 accident.

Prior to filing suit, an Aetna representative had indicated to Michael Ray's attorney that Aetna would resist any claim brought on behalf of Lacene because her negligence completely barred recovery. The Aetna representative further stated that Aetna considered Michael Ray's claim to be one of "policy limits."

Following the filing of the lawsuit, Michael Ray's attorney wrote a letter to Ronald Barta, attorney for Christina Gardenhire, who was a potential wrongful death claimant. The letter contained a thorough review of the pertinent facts and the applicable law concerning Michael Ray's personal injury claims and the other potential claimants' wrongful death claims. The letter evaluated the various claims as follows:

On November 22, 1989, we filed suit in Saline County against the other driver, his employers and their liability carrier (Aetna). I enclose a copy of the petition for your reference. As the petition indicates, we are seeking damages only for Michael Ray's personal injuries. We are not seeking "wrongful death" damages for Michael Ray's claim for loss of his mother. In our opinion, those damages are not recoverable because of Lacene's large degree of comparative negligence.

. . . . .

Aetna and its counsel believe that the wrongful death claims have no validity. As indicated earlier, we agree. Still, Aetna is hesitant to tender policy limits to Michael Ray. The purpose of this letter, therefore, is to ask your clients to waive in writing all claims arising out of this accident. In addition to explaining our position in this letter, we would be glad to answer any questions you or your clients may have. If your clients should choose not to waive their rights and this matter should proceed to trial on the wrongful death claims, Aetna has assured us they will vigorously contest all death claims because of Lacene's large amount of comparative negligence. The resultant extended litigation will do nothing more than cost all parties unnecessary attorneys' fees and expenses.

. . . . .

Any party seeking to recover for the wrongful death of Lacene Hall therefore steps in her shoes and must prove that her negligence is less than or equal to that of the truck driver Rogers. See *Wrongful Death in Oklahoma*, 11 Okla. City U.L.Rev. 287, 292 n. 17 (Summer 1986). Because of Lacene's high blood alcohol content, her refusal to wait for help at the shoulder of the interstate, her driving on the interstate (and not the shoulder) at well below minimum interstate speed, and her driving on interstate with a flat tire, it is extremely unlikely that a Saline County jury would find her 50% or less negligent. We therefore believe with Aetna that the claimants for her wrongful death will recover nothing.

Consequently, we have chosen not to seek damages for her wrongful death in the present Saline County suit.

. . . . .

We continue to strongly believe that Michael Ray's personal injury claim is worth substantially more than Aetna's policy limits. We also continue to strongly believe that Michael Ray will recover against Aetna's insured, with no diminution of his claim due to comparative negligence of himself or his mother. We also believe that his claim for wrongful death, like those of his two sisters, has no value as evidenced by our decision not to claim it in our pending lawsuit. Aetna agrees with our opinions. Because of the fact these wrongful death claims technically exist, however, Aetna hesitates to pay the policy limits to Michael Ray.

The letter asked Christina Gardenhire and her father to waive any claims arising out of the accident. A similar letter was sent to Karen Faulk, an attorney who represented Linda Hall and Alfred Hall, other potential wrongful death claimants. Attorneys for Michael Ray made additional efforts to obtain a waiver or a small settlement of these claims, but were unsuccessful.

At a settlement conference on January 16, 1990, Aetna representatives offered to settle Michael Ray's case by paying him the policy limits of $1 million. Aetna would use $300,000.00 to purchase an annuity, and the balance would be paid to Michael Ray's conservator. On January 17, 1990, counsel for Aetna informed Michael Ray's attorneys that Aetna would require that $50,000.00 of the $1 million settlement be placed in reserve for the potential wrongful death claims, even though Aetna believed that they had no value. Michael Ray's counsel objected to the reserve as unnecessary and suggested that the entire amount be paid to Michael Ray who would then agree to indemnify Aetna and its insureds for payment of any claims to wrongful death claimants. Aetna rejected the indemnity idea. Michael Ray's attorneys contend that Aetna's counsel told them that the cost of defending any wrong-

ful death claims would be Aetna's and would not be deducted from the $50,000.00. During the conversation of January 17, 1990, Aetna also requested that a local attorney be appointed as Michael Ray's guardian ad litem. The guardian ad litem would review and approve the settlement on Michael Ray's behalf. David M. Moshier, an attorney, was subsequently appointed as the guardian ad litem.

On January 19, 1990, Michael Ray's attorneys notified counsel for Aetna that the settlement offer would be accepted. In a letter dated January 22, 1990, Michael Ray's counsel stated the following:

> Our client has agreed to accept Aetna's offer of $1 million dollars in full settlement of his son's claim, and to release the Hood corporations from any further liability. The sum of $300,789.02 is to be used by Aetna to purchase Annuity Option I as outlined by Dennis Murnick on January 16, 1990. The annuity is to be purchased from United Pacific Life Insurance Company, and all payments under the annuity are to be guaranteed by both United Pacific and Aetna. The balance of the $1 million dollars is to be paid in a lump sum at the time of settlement. If the wrongful death claimants have not released their claims at the time of settlement, Aetna will retain a $50,000 reserve on the file. When those claims are satisfied, or the statute of limitations runs, the balance of the $50,000 will be remitted to our client and to us as his attorney.

Efforts to finalize the language of the settlement documents occurred from January 25, 1990 to January 31, 1990. There was discussion concerning the formulation of the clause providing for the reserve of the $50,000.00. Counsel for Michael Ray sought to preserve Michael Ray's wrongful death claim, arguing that Michael Ray had just as much entitlement to the reserved funds as the other claimants. This language was rejected by Aetna because they wanted a "complete release" document.

On January 31, 1990, a friendly settlement hearing was conducted in the state court litigation. Michael Russ testified at the hearing he understood that Aetna would be retaining $50,000.00 as a reserve until the other wrongful death claims were settled, and that Lacene Hall had two other children and a husband at the time of her death, and that there was a possibility that those individuals might make wrongful death claims. He further testified he understood that after the wrongful death claims were satisfied, there would hopefully be funds left from the $50,000.00 reserve. The guardian ad litem also testified at the hearing. He indicated he was aware of the $50,000.00 reserve and that it did not impact his ultimate conclusion that the settlement was in the best interest of Michael Ray. Subsequently, the following parties signed a release and settlement agreement: Michael Russ; counsel for Michael Ray; counsel for Aetna; a representative of Bank IV Salina; and the guardian ad litem. The court approved the release and settlement agreement. The court then dismissed the action with prejudice.

The release and settlement agreement contains, *inter alia*, the following provisions:

> WHEREAS, the plaintiff recognizes that this action involved some sharply contested issues of fact and law; that the resolution of these issues and the ultimate outcome of this litigation, after appeals, if any, cannot be predicted with any degree of certainty; that the consideration to the plaintiff for the herein proposed settlement is substantial; and that this action should be settled and terminated by appropriate release and stipulation for dismissal without further expense or delay; and
>
> WHEREAS, it is the intent and desire of the plaintiff to dispose of all claims and causes of action alleged or which could have been alleged by plaintiff in the above action or any other action or actions of any type or kind against the defendants herein above named or any other person, corporation, association, representative, agent or entity;
>
> . . . . . .
>
> 2. The plaintiff hereby in full and complete discharge, compromise, satis-

faction, and settlement of any and all claims of any nature that he may now have, whether known or unknown, or may hereafter have against the Aetna Casualty & Surety Company, Anthony Bruce Rogers, Jack Hood Transportation, Inc., Hood's News Agency, Inc., Jackie E. Hood, Ryder Truck Rental, Inc., and Dow Jones and Company, Inc., and their successors and assigns, their directors, officers, employees, agents, and all other persons, firms, or corporations liable or who might be claimed to be liable but who expressly deny any liability herein, acknowledges receipt and acceptance of the consideration hereinafter stated and does hereby waive, release, and renounce any and all rights, title, and interest in and to any cause of action alleged in the above captioned case or which could have been alleged, and any and all other manner of actions, causes of action, claims, demands, damages, costs, expenses and compensation, whatsoever in law or equity which he may now have or but for this release may hereafter have had against the Aetna Casualty & Surety Company, Anthony Bruce Rogers, Jack Hood Transportation, Inc., Hood's News Agency, Inc., Jackie E. Hood, Ryder Truck Rental, Inc., and Dow Jones and Company, Inc., and their successors and assigns, their directors, officers, employees' agents, and all other persons, firms, or corporations liable or who might be claimed to be liable but who expressly deny any liability herein, arising out of or based upon any fact, condition, or occurrence which occurred prior to or existed on the date of execution hereof, whether or not such fact, condition, or occurrence shall be known or unknown to the plaintiff, including without limitation, any claim or cause of action arising out of an automobile accident which occurred on or about the date of February 3, 1989.

．　　．　　．　　．　　．

4. As a further consideration of the sums as hereinafter set out, plaintiff warrants that no promise or agreement not herein expressed has been made to him; that in executing this release he does not rely upon a statement or representation made by the parties released or by said parties, agents, servants, or employees, but relies solely upon his judgment that the sums hereinafter stated are received in full compromise settlement.of satisfaction of all the aforesaid claims and demands whatsoever; that the consideration expressed herein is the sole consideration of this release and said consideration is contractual and not a mere matter of recital. It is further understood and agreed that the settlement is a compromise of a doubtful and disputed claim and that the payment of such sum is not to be construed as an admission of liability on the part of the parties released, by whom liability is expressly denied.

．　　．　　．　　．　　．

## I.

Payment by the Aetna Casualty & Surety Company in the sum of $699,-210.98 on January 31, 1990, receipt of which is hereby acknowledged, with the exception of fifty thousand dollars ($50,-000.00), the payment of which is more fully set forth in subparagraph IV of paragraph 6.

．　　．　　．　　．　　．

## IV.

The Aetna Casualty & Surety Company shall retain in its file reserves for this claim, $50,000 from the cash payment identified in subparagraph I above. Said amount shall be held by Aetna for the sole purpose of resolving any and all outstanding claims or potential claims which have been asserted or may be asserted on account of the alleged wrongful death of Lacene J. Hall, deceased. The Aetna Casualty & Surety Company shall have the unfettered discretion to use said funds to satisfy any and all such claims as it sees fit either by settlement or payment of judgments, if any. The balance of the funds remaining in said reserve shall be paid to plaintiff upon the occurrence of any of the following:

(a) The expiration of the statute of limitations on February 3, 1991, plus 45

days, if no actions for damages have been commenced by any heir at law of Lacene J. Hall, deceased, for her alleged wrongful death; or,

(b) the resolution of all claims of all heirs at law of Lacene J. Hall, deceased, for her alleged wrongful death, as determined by descent and distribution proceedings in the District Court of Saline County, Kansas, by Release and Settlement Agreement; or,

(c) the satisfaction of any and all judgments rendered in favor of the heirs at law of Lacene J. Hall, deceased, for her alleged wrongful death.

Following the dismissal of Michael Ray's case, Michael Ray's counsel again sent a letter to counsel for the Halls and Gardenhire. In the letter, he offered to settle each child's claim for $1500.00, with the offer to expire on February 14, 1990. The letter also stated that no other offers would be made after that date. On February 14, 1990, Halls' counsel called Michael Ray's attorney and indicated that she was recommending to her clients that they accept the $1500.00 to settle their claims. She was never heard from again. No response was ever received from Gardenhire's attorney.

On January 30, 1991, Aetna's counsel called to inform Michael Ray's attorney that the Halls had a different attorney who recently filed a wrongful death suit in their behalf in Oklahoma. On February 1, 1991, Aetna's counsel wrote Michael Ray's attorney and enclosed a copy of the Halls' complaint and other court documents. He further stated: "I will keep you further advised as we proceed in this matter."

Counsel for Michael Ray contends that they were not subsequently advised as to the progress of the Oklahoma litigation. They learned in September 1991 that the Oklahoma litigation had been settled by Aetna for $55,000.00 over two months ago. Of that amount, $50,000.00 came from the reserve, and $5,000.00 from Jack Hood Transportation, Inc. The case had been dismissed with prejudice and the $55,000.00 ordered distributed to Linda Hall and her counsel on July 9, 1991.

Both Michael Ray's counsel and the guardian ad litem were surprised to hear about the settlement. On September 5, 1991, Michael Ray's counsel wrote a letter to Aetna's counsel demanding payment of the $50,000.00. The letter stated that suit would be filed after ten days. Aetna did not respond to the letter, and this action was filed on September 27, 1991. Michael Ray's attorneys contend that an Aetna representative called them on or about October 3, 1991 and stated that he had never received the September 5th demand letter. They also assert that he stated that if much of a defense of the Hall lawsuit had been put up, the $50,000.00 would have been consumed by defense costs. Finally, they represent that he indicated that if prior counsel had stated that the wrongful death claims had no value, that counsel had no authority to make such a statement.

### Breach of Contract

In this action, plaintiff raises two breach of contract claims and some misrepresentation claims. We shall first address the breach of contract claims. First, plaintiff contends that Aetna breached an express contract covenant to properly use discretion. Second, plaintiff asserts that Aetna breached an implied covenant of good faith.

■ In the instant motion, defendant argues that the language of the settlement agreement precludes the contract claims made by the plaintiff. Defendant's arguments concerning plaintiff's breach of the settlement agreement claims are based on the language contained in subparagraph IV of paragraph 6 of the release and settlement agreement. The defendant argues that it had "unfettered discretion" to use the funds in the reserve. Defendant contends that the plaintiff cannot now complain how those funds were spent.

Plaintiff argues in response that Kansas law requires that the defendant exercise the discretion allowed it in the settlement agreement in "good faith." Relying upon *Lessley v. Hardage*, 240 Kan. 72, 727 P.2d 440 (1986), plaintiff contends that even contract clauses allowing a party to exercise its judgment with discretion must be done

in good faith. Finally, plaintiff asserts that the settlement agreement's provision allowing "unfettered discretion" to Aetna does not eliminate a good faith obligation because Aetna had a "fiduciary relationship" with Michael Ray and his conservator.

In Kansas, contracting parties "may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and that in the absence of fraud, mistake, or duress a party who has fairly and voluntarily entered into such a contract is bound." *Adams v. John Deere Co.,* 13 Kan.App.2d 489, 774 P.2d 355, 357 (1989). Clear and unambiguous language in a written contract is controlling. *Fast v. Kahan,* 206 Kan. 682, 481 P.2d 958, 961 (1971).

Kansas courts have followed the trend of implying the covenant of good faith and fair dealing to almost every contract. *Bonanza, Inc. v. McLean,* 242 Kan. 209, 747 P.2d 792 (1987). *But see Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987) (implied covenant of good faith and fair dealing as applicable to all contracts is "overly broad and should not be applicable to employment-at-will contracts"). Some understanding of this covenant is necessary in considering its application here.

In *Pizza Management, Inc. v. Pizza Hut, Inc.,* 737 F.Supp. 1154, 1178–79 (D.Kan.1990), Judge Crow set forth some basic principles applicable to the implied covenant of good faith and fair dealing:

> The implied covenant of good faith and fair dealing particularly comes into play in those circumstances where the parties to the contract realize detailed provisions on performance would be ineffectual, frustrating, or impractical. The parties are then forced to confer control of a contract term, or discretionary authority, upon one another, leaving each to depend on the good faith of the other. *See, e.g., Boone v. Kerr–McGee Oil Industries,* 217 F.2d 63, 65 (10th Cir.1954). By employing this doctrine, a court forces the parties to perform consistent with their intentions and expectations which are embodied, expressly and impliedly, in the terms of their agreement. For example, the duty of good faith could be breached by one party exercising its discretion for purposes not reasonably contemplated or assumed as a risk by the other party. *See, Best [v. U.S. National Bank of Oregon],* 303 Or. [557] at 563, 739 P.2d 554 [(1987)]; *Boone,* 217 F.2d at 65; *see generally* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369, 383–387 (1980).

The implied covenant is derivative in nature, that is, it does not create or supply new contract terms but grows out of existing ones. *See Metromedia Broadcasting v. MGM/UA Entertainment,* 611 F.Supp. 415, 421 (D.Cal.1985); *Gordon v. Matthew Bender & Co., Inc.,* 562 F.Supp. 1286, 1289 (N.D.Ill.1983); *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 482 (Tex.Ct.App.1989). " '[E]ssential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.' " *Bonanza, Inc.,* 242 Kan. at 222, 747 P.2d 792 (quoting 17 Am.Jur.2d, Contracts § 256, pp. 653–54 (1964)); *see Metromedia Broadcasting,* 611 F.Supp. at 421 (the implied covenant does not supply new or different rights and obligations to those expressly agreed to by the parties); *Gordon,* 562 F.Supp. at 1289–90 (an obligation cannot be implied if it would be inconsistent with other express terms of the contract). The duty of good faith assumes the existence of a contractual right; it does not create one. *Noller v. General Motors Corp.,* 13 Kan.App.2d [13] at 35, 760 P.2d 688 [(1988)] (J. Davis, concurring and dissenting). Because the goal of this implied duty is to effectuate the parties' express promises, breach of this duty is actionable when it relates "to some aspect of performance under the terms of the contract." *Adolph Coors Co.,* 780 S.W.2d at 482. A breach occurs when a party's actions are commercially unreasonable. *Larese v. Creamland Dairies, Inc.,* 767 F.2d 716, 717–18 (10th Cir.1985); *Burgess Const. Co. v. M. Morrin & Son Co., Inc.,* 526

F.2d 108, 115 (10th Cir.1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976); *see* Restatement (Second) of Contracts § 205 comment d (1979) ("abuse of a power to specify terms").

In *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 729 (10th Cir.1991), the Tenth Circuit noted the following concerning the implied covenant of good faith and fair dealing:

We have observed that "[t]he purpose of the good faith doctrine in contract law is to protect the reasonable expectations of the parties by 'implying terms in the agreement,'" and that the covenant generally applies to all contractual provisions. *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir.1988) (quoting Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 670 (1963)). But, as noted in *Big Horn,* the concept of good faith becomes irrelevant in the interpretation of a contractual provision which grants "uncontrolled discretion" to one of the parties. *Id.* at 1267–68 (citing *Tymshare v. Covell,* 727 F.2d 1145, 1153 (D.C.Cir.1984)).

■ The language contained in subparagraph IV of paragraph 6 of the release and settlement agreement allows Aetna "unfettered discretion" to use the funds set aside in the reserve to satisfy any and all claims asserted on account of the alleged wrongful death of Lacene Hall. The power created in Aetna by this language precludes the plaintiff from contending that it had a reasonable expectation of any implied protection. The concept of good faith, as indicated in *Devery Implement,* became irrelevant. To apply a duty of good faith here would create a contractual right. A court cannot make a better contract for the parties than they have made themselves. The only duties imposed upon Aetna by this provision were (1) to pay only claims asserted on account of the alleged wrongful death of Lacene Hall; and (2) to return any funds remaining in the reserve to the plaintiff. The implied covenant of good faith and fair dealing would apply to these contractual duties. However, there is no contention by the plaintiff that Aetna failed to comply with these requirements.

■ In an effort to avoid the "unfettered discretion" language contained in the agreement, plaintiff suggests that Aetna had a fiduciary relationship with Michael Ray and his conservator. Plaintiff contends that a fiduciary relationship arose because Michael Ray and his conservator placed a special confidence in Aetna.

■ There are two types of fiduciary relationships generally recognized in Kansas: "(1) those specifically created by contract such as principal and agent, attorney and client, and trustee cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor and administrator of an estate, among others and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235, 1241 (1982).

■ Under Kansas law, a fiduciary relationship is never presumed, but must be proved by clear and convincing evidence. *Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). The burden of proving such a relationship is upon the party asserting it. *Id.*

In this case, we are concerned with the second type of fiduciary relationship listed in *Denison State Bank.* In *Rajala,* the court summarized the law in Kansas concerning this type of fiduciary relationship as follows:

Determination of whether this second type of fiduciary relationship " 'exists depends on the facts and circumstances of each individual case. [The Supreme Court of Kansas] has refused, for that reason, to give an exact definition to fiduciary relations.' " *Id.* (quoting *Curtis v. Freden,* 224 Kan. 646, 651, 585 P.2d 993, 998 (1978)). Although such fiduciary relationships cannot be defined with

precision, the Supreme Court of Kansas has prescribed "certain broad principles" which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation:

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

*Id.* (emphasis in original). The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and *unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.*" *Denison,* 230 Kan. at 696, 640 P.2d at 1243–44 (emphasis added). The court went on to state that "[t]his is particularly true when one ... is fully competent and able to protect his own interests." *Id.*

A fiduciary relationship whereby both parties assume fiduciary obligations to each other or to a common entity similarly requires a conscious assumption of fiduciary obligations by the parties. For example, in *Paul v. North,* 191 Kan. 163, 380 P.2d 421 (1963), the Supreme Court of Kansas stated that fiduciary relationships

"may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties.... But they

necessarily spring from an attitude of trust and confidence and *are based upon some form of agreement, either expressed or implied, from which it can be said that the minds have met in a manner to create mutual obligations.*"

*Id.* 191 Kan. at 170, 380 P.2d at 426 (citations omitted) (emphasis added). Although a fiduciary relationship may arise out of an agreement to act together for the mutual benefit of the parties, such a relationship cannot be established by accident or inadvertence.

"Mere concert of action without more, does not establish a fiduciary relationship.... Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they *willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises.*"

*Wolf v. Brungardt,* 215 Kan. 272, 285, 524 P.2d 726, 736 (1974) (emphasis added).

This court has also recognized that conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law. *See Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 n. 3 (10th Cir.1987); *cf.* 36A C.J.S. *Fiduciary,* 385 (1955) ("As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship") (footnotes omitted).

919 F.2d at 614–15.

In evaluating the evidence presently before the court, we find insufficient evidence to establish the existence of a fiduciary duty. The parties here were adversaries. The facts do not suggest that Aetna was to act "primarily" for the benefit of the plaintiff. Aetna was given "unfettered discretion" to settle the remaining claims with any monies left over to be returned to the plaintiff. The facts also do not suggest the

superiority of one of the parties over the other. Both sides were represented by able counsel, and the plaintiff had the further benefit of representation by a guardian ad litem. Plaintiff could have obtained the contractual guarantees and rights that it now wishes it had. But, instead, plaintiff agreed to the provisions contained in the settlement agreement allowing Aetna unfettered discretion in disposing of the funds held in the reserve. There is no evidence before the court that Aetna ever "consciously assumed" fiduciary duties as to Michael Ray, his conservator, or his guardian ad litem concerning the reserve fund. Absent such evidence, we are unable to conclude that a fiduciary relationship existed between Aetna and plaintiff.

In sum, the court finds that the defendant is entitled to summary judgment on plaintiff's breach of contract claims.

*Misrepresentation*

■ We next turn to plaintiff's misrepresentation claims. Plaintiff contends that the parties representing Michael Ray were induced to settle his personal injury lawsuit and not seek wrongful death damages in it or in the later Oklahoma lawsuit due to misrepresentations made by the defendant. These misrepresentations apparently are: (1) that the wrongful death claims of the other claimants had no value; and (2) that Aetna would vigorously defend against any other claims. The defendant contends that it is entitled to summary judgment on these claims because the representations do not amount to statements which those parties representing Michael Ray could rely upon or should have relied upon in making a decision concerning Michael Ray's wrongful death claims.[2]

■ In order to prove a fraudulent misrepresentation claim, a plaintiff in Kansas must prove: (1) an untrue statement of material fact; (2) known to be untrue by the person making it; (3) made with an intent to deceive or recklessly made with disregard for its truthfulness; and (4) the justifiable reliance of another party on the statement's truthfulness and injury as a result of the reliance. *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 739 P.2d 444, 450 (1987). The injured party's reliance on a fraudulent misrepresentation must be reasonable, justifiable and detrimental. *Id.*

Aetna's arguments concerning the misrepresentations are twofold. First, it contends that any statements made by its counsel or its representatives were mere opinions, not statements of existing and material fact. Second, it asserts that the record establishes that the plaintiff did not justifiably rely upon any statements made by its counsel or representatives.

" 'To be actionable, a false representation must be one of fact as distinguished from an expression of opinion, which ordinarily is not presumed to deceive or mislead, or to influence the judgment of the hearer, and on which he has no right to rely, since he is assumed to be equally able to form his own opinion.' " *Fisher v. Mr. Harold's Hair Lab, Inc.,* 215 Kan. 515, 527 P.2d 1026, 1033 (1974) (quoting 37 C.J.S. Fraud § 10, pp. 226–27).

In *Hawthorne–Mellody, Inc. v. Driessen,* 213 Kan. 791, 518 P.2d 446, 452 (1974) (quoting *Holcomb & Hoke Manufacturing Co. v. Auto Interurban Co.,* 140 Wash. 581, 250 P. 34, 35 (1926)), the Kansas Supreme Court explained the difference between a mere expression of opinion and a misrepresentation which is intended to be relied upon and to induce another party to enter a transaction:

> If one merely states that, in his opinion, no matter what form the words may

---

2. *In response to the defendant's motion, plaintiff argued that the defendant had addressed only plaintiff's claims of fraudulent misrepresentation and had not addressed plaintiff's claims of "lesser forms" of misrepresentation. Plaintiff asserted that these "lesser forms" of misrepresentation therefore remained in dispute. The court assumes that plaintiff means "negligent misrepresentation" claims. We fail* to find any mention of such claims in the complaint, but even if such claims were properly stated, we find that the defendant is also entitled to summary judgment on these claims. For the purposes of this opinion, it is not necessary to discuss all the intricacies of such claims. We simply note that plaintiff's failure to prove justifiable reliance on a false statement is fatal to these claims.

take, a given result will follow from a given act, no action will lie upon the expression, no matter how much another may have relied thereon to his injury. But if he states that he has, by reason of his observations and experience, particular knowledge of the subject, and knows because of his particular knowledge that a given result will follow from the given act, an action will lie thereon, if it is falsely made, by one who has acted thereon to his injury. The distinction is that in the one instance there is merely the expression of an opinion, while in the other there is a statement of fact blended with the expression of opinion; there is an implied assertion that he knows facts which justify and make certain his opinion.

■ In applying the aforementioned rule, the court must carefully examine the context of the circumstances under which the statements are made, particularly the relationship of the parties. In a situation where the person making the statement has superior knowledge of the subject, and the terms of the agreement are unequal, a statement which would otherwise be one of opinion may be regarded as one of fact. *Fisher*, 527 P.2d at 1033.

In this case, the statements of Aetna's counsel and representatives concerning the value of the outstanding wrongful death claims are obviously an expression of an opinion and cannot be understood to be anything else. The statements made by Aetna and its representatives made no guarantees that none of the $50,000.00 reserve fund would be paid to satisfy the wrongful death claims. Aetna was simply of the view that the wrongful death claims had little value. This was an opinion related by attorneys or others upon the advice of attorneys to attorneys for Michael Ray. Michael Ray's attorney and his guardian ad litem had both the skill and the ability to independently assess the potential wrongful death claims and, in fact, they did make such an assessment. They reached exactly the same opinion as the Aetna attorneys.

■ The statements made by Aetna's representatives concerning Aetna's inten-tion to vigorously defend any wrongful death claims that were filed are quite different from the statements concerning the value of those claims. These statements would appear to be ones of fact. Accordingly, we do not find that Aetna is entitled to summary judgment on the basis of this argument as it relates to the statements that Aetna would vigorously defend any wrongful death claims.

This leads us to the related issue of whether the parties representing Michael Ray could justifiably rely upon the representations made by Aetna and its representatives. The evidence before the court, when viewed in the light most favorable to the plaintiff, fails to disclose evidence of "justifiable" reliance on either of the statements made by Aetna's counsel and representatives. During the dealings that led up to the settlement agreement, counsel for Michael Ray reached their own opinion as to the value of the wrongful death claims, including Michael Ray's claim. In the settlement agreement, Michael Ray's father, Michael Ray's counsel, the conservator and the guardian ad litem each acknowledged that they had not relied upon any statements or agreements made by Aetna in accepting the settlement offer.

Any suggestion by Michael Ray's counsel, the conservator, or the guardian ad litem that they relied upon the statements made by Aetna's representatives or its counsel in deciding to enter into the settlement agreement and not seek wrongful death damages appears specious. In the settlement agreement, the parties representing Michael Ray specifically waived Michael Ray's right to any wrongful death damages. They further agreed to allow Aetna to use "unfettered discretion" to resolve any wrongful death claims that arose. Michael Ray's counsel and the guardian ad litem were of the opinion that Michael Ray's wrongful death claim was of little value and that the wrongful death claims of the other relatives of Lacene Hall were also virtually worthless. The contention that the parties representing Michael Ray relied upon the statements of Aetna are simply not reasonable and justifiable. We

fail to see how they could have relied upon the representations of Aetna given the circumstances of this case. Accordingly, the court finds that the defendant is also entitled to summary judgment on plaintiff's misrepresentation claims.

IT IS THEREFORE ORDERED that defendant's motion to dismiss or, in the alternative, for summary judgment (Doc. # 15), which the court has construed as a motion for summary judgment, is hereby granted. Judgment shall be entered for the defendant and against the plaintiff on all claims.

IT IS SO ORDERED.