FEDERAL DEPOSIT INSURANCE COR-
PORATION, in its corporate capacity, a
corporate agency of the United States
Government, Plaintiff–Appellee,

v.

Richard J. NANULA,
Defendant–Appellant.

No. 88–3255.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1989.

Decided March 27, 1990.

**546**

Scott G. Golinkin, Judi Katz, Fern Bomchill, Mayer, Brown & Platt, Chicago, Ill., Jaclyn C. Taner, Sharon Powers Sivertsen, Federal Deposit Ins. Corp., Washington, D.C., for plaintiff-appellee.

Edward S. Margolis, Keith A. Ligon, Teller, Levit & Silvertrust, Chicago, Ill., for defendant-appellant.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Richard J. Nanula appeals the district court's grant of summary judgment in favor of the plaintiff-appellee, Federal Deposit Insurance Corporation ("FDIC"). The district court found Nanula liable to the FDIC in the amount of $148,545.19 based on a loan assumption agreement and a limited partnership agreement Nanula executed while a limited partner in the Wellspring Barge Limited Partnership ("WBLP"), which subsequently assigned the contracts to the FDIC. We affirm.

### I.

The WBLP partnership, whose business consisted of the operation of grain barges on the United States' inland waterway system, became operational on December 9, 1981. Nanula was one of 75 Type A limited partners in WBLP, owning one of 99 limited partnership units. Pursuant to the limited partnership agreement, Nanula made an initial capital contribution of $50,000 and executed a "Subscription Note" obligating him to make an additional payment of $25,000 in the future, as well as a "Promissory Note" to WBLP in the amount of $75,000. Nanula also agreed to make additional capital contributions at the request of WBLP's general partner [1] if and when WBLP was unable to pay current debt service on the partnership's long-term financing.[2] The limited partnership agreement also required that Nanula and the other limited partners execute "assumption agreements"—essentially loan guaranties—obligating each limited partner to assume a pro rata share—1/99th in Nanula's case—of the principal of and interest on various loans made to the limited partnership, one of which was an $18 million short-term loan from Equitable Shipyards, Inc. ("Equitable").

On October 5, 1982, WBLP entered into a loan agreement with Continental Illinois National Bank ("Continental") obligating Continental to make a $16,575,000 loan to the partnership to retire the majority of WBLP's debt to Equitable.[3] As security for the loan, the Continental loan agreement provided that as a condition precedent to advancing the loan to WBLP, all Type A limited partners were required to execute assumption agreements guaranteeing their respective pro rata shares of the principal of and interest on the Continental loan. Nanula and 71 other limited partners, representing 96 of the 99 limited partnership units, executed assumption agreements dated October 5, 1982. The other three limited partners declined to execute similar assumption agreements.

Closing for the Continental loan took place on November 16, 1982. Because assumption agreements were received from only 96 of the 99 limited partnership units, Continental, in accordance with its commit-

---

1. The general partner in WBLP was Wellspring Energy Corporation, who acted through its president, John P. Madgett, III.

2. As discussed, *infra,* WBLP eventually obtained its long-term financing from Continental Illinois National Bank.

3. The remainder of WBLP's debt to Equitable was satisfied through additional capital contributions from the limited partners.

ment letter of September 15, 1982,[4] reduced its funding of the loan by $502,273, representing ⁹⁄₉₉ths of the original loan amount. Nonetheless, the principal amount of the loan remained fixed at $16,575,000 since Equitable agreed to carry this portion of the loan (through a ⁹⁄₉₉ths participation in the loan) based on its previous loan to the partnership. Under the terms of the loan agreement, the limited partners executing assumption agreements on the Continental loan, including Nanula, were relieved of their obligations under their prior assumption agreements executed as security for the Equitable loan. However, the three limited partners who refused to execute Continental assumption agreements remained liable under their Equitable assumption agreements based on Equitable's ⁹⁄₉₉ths participation in the Continental loan. Nanula was notified of the circumstances surrounding the closing of the Continental loan and his release from his Equitable assumption agreement on February 1, 1983.

On September 26, 1984, as part of a multi-billion dollar assistance package to Continental, the FDIC purchased all of Continental's rights, claims and interests in the loan agreement with WBLP and all documents executed in connection therewith, including Nanula's assumption agreement. An officer of Continental acted as the FDIC administrator in the collection of the loan payments from WBLP.

In connection with WBLP's long-term financing, i.e., the Continental loan, the general partner made several demands on the limited partners to contribute additional capital because WBLP was unable to make its quarterly loan payments due to cash flow problems. Many of the limited partners, including Nanula, failed to make the additional capital contributions. On November 13, 1986, the general partner made a written demand of Nanula for payment

of his outstanding capital contributions totalling $51,000 as of that date. Despite this demand, Nanula failed to make the required capital contributions per his obligations under the limited partnership agreement.

Due to the failure of many limited partners to make the required capital contributions, WBLP defaulted on its loan with Continental. The FDIC, through its administrator at Continental, declared the loan in default on December 10, 1986, and demanded that WBLP pay the remaining loan balance immediately. On that date, the loan had an unpaid principal balance of $14,116,325. On January 26, 1987, WBLP, in an effort to reduce the outstanding principal balance on the Continental loan, assigned its rights under the limited partnership agreement to recover unpaid capital contributions from the Type A limited partners to the FDIC. In a letter of February 20, 1987, the FDIC informed Nanula that under his Continental assumption agreement, he was liable for ¹⁄₉₉th of the outstanding principal of and interest on the Continental loan, and that under the limited partnership agreement he was liable for all unpaid capital contributions plus the interest accruing thereon. Despite the FDIC's demand for immediate payment, Nanula refused to honor his obligations under the agreements.

The FDIC filed suit against Nanula on May 22, 1987. In Count I of its complaint, the FDIC, as assignee of Continental, sought to recover $142,589 (¹⁄₉₉th of the $14,116,325 outstanding principal balance on the Continental loan) and ¹⁄₉₉th of the interest accruing thereon, representing Nanula's liability under the Continental assumption agreement. In Count II, the FDIC, as assignee of WBLP, sought to recover Nanula's $51,000 in unpaid capital contributions and the interest accruing thereon. On February 8, 1988, Nanula

**4.** Continental's commitment letter provided in relevant part:

"Our commitment assumes, of course, 100% coverage of the term loan by Assumption Agreements.... To the extent that the partnership has any 'dissident' limited partners at the time of loan closing (whether by failure to sign an acceptable Assumption Agreement or by default in the payment of previous capital calls), the $16,575,000 loan amount would be proportionately reduced or some other mutually acceptable solution would need to be worked out."

filed a motion for summary judgment, alleging that he was entitled to judgment as a matter of law on Count I because his assumption agreement was subject to the condition precedent that Continental obtain similar agreements from each Type A limited partner, which Continental failed to do, thus rendering his assumption agreement unenforceable. With regard to Count II, Nanula claimed that summary judgment was appropriate as the limited partnership agreement placed a $150,000 ceiling on his personal liability to WBLP, which had been fully satisfied, thus extinguishing his liability for the $51,000 in unpaid capital contributions. The FDIC filed a cross-motion for summary judgment on May 13, 1988, arguing that: Nanula's liability under the Continental assumption agreement was unconditional and, thus, Continental's failure to obtain agreements from each WBLP limited partner did not render Nanula's assumption agreement unenforceable; and the limited partnership agreement did not limit Nanula's liability to $150,000, but rather obligated him to make all capital contributions requested by the general partner.

On July 21, 1988, the district court granted the FDIC's summary judgment motion and denied Nanula's motion, finding that Nanula was unconditionally liable under the Continental assumption agreement and that the partnership agreement did not place a $150,000 limit on Nanula's liability for capital contributions. The court deferred its ruling on the question of damages because of insufficient evidence in the record to determine the extent of Nanula's liability to the FDIC at that time. The parties thereafter supplemented the record with financial information on the damages question and the court, on November 2, 1988, found that Nanula's liability to the FDIC totalled $202,971.10,[5] but that he was entitled to a credit of $54,425.91 based on the value of WBLP assets received by the FDIC, resulting in a total liability of $148,545.19.

On appeal, Nanula argues that the district court erred in granting summary judgment to the FDIC, alleging that: (1) Continental's failure to comply with the condition precedent that each Type A limited partner execute an assumption agreement renders his assumption agreement unenforceable; and (2) the $54,425.91 credit he received from the FDIC (based on the value of WBLP assets turned over to the FDIC) completely extinguished his liability for unpaid capital contributions and the interest accruing thereon. Before addressing the merits of Nanula's contentions, we note that "[a] motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion." *Beard v. Whitley County REMC*, 840 F.2d 405, 409–10 (7th Cir.1988). For the most part, the facts of this case are not in dispute. Nanula's challenges to the district court's grant of summary judgment in favor of the FDIC involve interpretations of the assumption agreement and the partnership agreement, both of which are questions of law. Thus, "our inquiry is limited to determining whether the district court erred in concluding that [the FDIC] is entitled to judgment as a matter of law. Our review is *de novo*." *Commercial Union Ins. Co. v. Ramada Hotel Operating Co.*, 852 F.2d 298, 300 (7th Cir.1988).

## II.

Nanula initially contends that the district court erred in determining that his obligations under the Continental assumption agreement were unconditional. He argues that his assumption agreement was subject

---

**5.** The court found that under Count I of the complaint, the FDIC was entitled to recover $146,871.10, representing Nanula's liability under the assumption agreement for 1/99th of the outstanding principal of, and interest on, the Continental loan. Under Count II, the court found that the FDIC was entitled to recover $56,100, representing Nanula's $51,000 liability for unpaid capital contributions plus interest ($5,100) accruing at 5 percent per annum from November 13, 1986, until November 2, 1988.

to the condition precedent that Continental obtain similar agreements from each Type A limited partner and that Continental's failure to obtain assumption agreements from three limited partners renders his agreement unenforceable. The FDIC argues, as in the district court, that Nanula's obligations under the Continental assumption agreement were not conditioned on similar undertakings by the other Type A limited partners and, thus, Nanula is not relieved from liability for a ¹/₉₉th share of the principal of and interest on the Continental loan.

As noted above, the assumption agreement involved in this case is essentially a contract of guaranty. A contract of guaranty may be subject to the condition that others will also become co-guarantors of the debt, and the failure on the part of the lender to meet this condition renders the guaranty unenforceable. *State Bank of East Moline v. Cirivello*, 74 Ill.2d 426, 24 Ill.Dec. 839, 841, 386 N.E.2d 43, 45 (1979). Nanula argues that his assumption agreement was subject to a similar condition since Continental conditioned the making of the partnership loan on the receipt of assumption agreements from all Type A limited partners: "[T]he Investor acknowledges that the Bank [Continental] would not be willing to make the Partnership Loan but for the execution and delivery by the Investor and all other Type A Limited Partners of this Assumption Agreement and the Other Assumption Agreements." Continental Assumption Agreement ¶ 2.[6] In support of this argument, Nanula relies almost exclusively on *Cirivello, supra*, a case involving a personal guaranty executed by twelve limited partners within a limited partnership as security for a bank loan. In that case the bank making the loan, contemporaneous to the execution of the guaranty, represented that the loan would not be advanced unless all of the limited partners within the limited partnership signed the guaranty agreement. Although only twelve of thirteen limited partners signed the guaranty, the bank disbursed the loan. After the limited partnership defaulted, the bank filed suit against the twelve limited partners to enforce the guaranty. The Supreme Court of Illinois held that despite the fact that the loan agreement and guaranty were two separate contracts, under the facts of that case, the conditional nature of the loan rendered the guaranty conditional on all limited partners becoming guarantors of the loan:

> "The guaranty, as an obligation collateral to the debt on the loan, would have no effect unless the loan was issued and the principal debt incurred. By representing that the loan would not be advanced without the personal guaranties of all the limited partners, [the bank] was also representing that the guaranty would not become effective unless all thirteen signed."

*Cirivello*, 24 Ill.Dec. at 842, 386 N.E.2d at 46. Despite the obvious similarities between *Cirivello* and the case at bar, we find Nanula's reliance on *Cirivello* to be misplaced.

The guaranty in *Cirivello* and the assumption agreement in this case are very different, both in structure and content. The *Cirivello* guaranty was a standard form contract containing general language[7] which "purport[ed] to be [a] con-

---

6. We note that this condition was reiterated in section 8.1 of the loan agreement between Continental and WBLP:

    "The obligation of the Bank to make the Loan is, ... subject to the condition precedent that it shall have received all of the following, each duly executed and dated the date of the Loan or such other date prior thereto satisfactory to the Bank, in form and substance satisfactory to the Bank:

    Section 8.1.4 *Assumption Agreements*. The Assumption Agreements, signed by each Type A Limited Partner."

7. *See State Bank of East Moline v. Cirivello*, 56 Ill.App.3d 269, 14 Ill.Dec. 306, 372 N.E.2d 111 (1978), *rev'd*, 74 Ill.2d 426, 24 Ill.Dec. 839, 386 N.E.2d 43 (1979):

    "The guaranty signed by defendants, provided in part:
    'TO STATE BANK OF EAST MOLINE
    \* \* \* \* \* \*
    The undersigned hereby requests you to give, and continue to give LAKEVIEW–ESTATES–LIMITED PARTNERSHIP \* \* \* from time to time, as you see fit, financial accommodations and credit, and \* \* \* the undersigned hereby guarantee and promise and

tinuing, unconditional guarant[y] of the loan...." 24 Ill.Dec. at 841, 386 N.E.2d at 45. However, the *Cirivello* guaranty did not contain explicit language stating that the guarantors' obligations thereunder were unconditional, nor was there language to the effect that the guaranty of one limited partner was not conditional on the other limited partners becoming co-guarantors. Nanula's assumption agreement, on the other hand, is much more specific. Two provisions within the agreement explicitly state that the agreement and/or Nanula's obligations thereunder are unconditional.[8] More importantly, paragraph 5 of the agreement provides in relevant part: "The Investor's [Nanula's] obligation hereunder is not contingent upon or affected by the similar undertakings by other Type A Limited Partners evidenced by the Other Assumption Agreements." Thus, the very language in Nanula's assumption agreement clearly and unambiguously states that his agreement is *not* conditioned on the other limited partners becoming co-guarantors of the Continental loan. Although Illinois law requires that "[a] guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, ... [w]here the language of a contract is unequivocal, it must be carried out according to its language." *McLean County Bank v. Brokaw*, 119 Ill.2d 405, 116 Ill.Dec. 561, 564, 519 N.E.2d 453, 456 (1988). In view of the explicit language in paragraph 5 of Nanula's assumption agreement, we reject his argument that the agreement was conditioned on all of the Type A limited partners becoming guarantors of the Continen-

tal loan and hold that Nanula is unconditionally liable to the FDIC, as assignee of Continental, under the agreement for 1/99th of the principal of and interest accruing on the Continental loan, which the district court found to be $146,871.10.[9]

Even if we agreed with Nanula's contention that his assumption agreement was conditioned on Continental's receipt of similar agreements from all Type A limited partners, which we do not, our holding would remain the same. The provision that the loan would not be advanced without assumption agreements from all limited partners was placed in the contract solely for Continental's benefit. Thus, under Illinois law Continental was free to waive strict compliance with this provision by advancing the loan without obtaining assumption agreements from each Type A limited partner in WBLP. *See Lempera v. Karner*, 79 Ill.App.3d 221, 34 Ill.Dec. 549, 398 N.E.2d 224, 225 (1980); *Bartels v. Denler*, 30 Ill.App.3d 499, 333 N.E.2d 640, 642 (1975). Nanula, again relying on *Cirivello*, argues that the bank was not free to waive this provision because the condition benefited him, as well as Continental, by preserving the limited partners' "equality of obligation." Specifically, Nanula argues that the provision benefited him because it insured that all limited partners would be liable for their pro rata shares of the Continental loan, as well as for additional capital contributions to enable WBLP to pay current debt service thereon. Nanula claims that Continental, in advancing the loan without satisfying this condition, deprived him of this benefit, which he relied upon in

---

agree to make prompt payment to you, as they severally mature, * * * of all loans made, or which may be made by you to said borrower * * *.

'If this guaranty be executed by more than one signer all of the obligations hereby created, and all agreements herein contained shall be the several obligations and agreements of each of the undersigned, but at your option any or all of the same may be enforced against any or all of the undersigned jointly.'

The guaranty form also contained a provision permitting any signer to withdraw from the guaranty upon notice to the plaintiff-bank."
4 Ill.Dec. 308–09, 372 N.E.2d at 113–14.

8. *See* Continental Assumption Agreement at ¶ 3 ("to induce the Bank to make the Partnership Loan, the Investor hereby unconditionally assumes the due and punctual payment of the Partnership Loan...."); ¶ 12 ("This Assumption Agreement shall in all respects be a continuing, absolute and unconditional agreement....").

9. The FDIC has not requested that the district court's determination of damages be increased by the interest accruing between November 2, 1988, the date of the district court's decision, and the date of this decision. Thus, we express no opinion on whether the FDIC is entitled to such increased damages.

signing the assumption agreement; thus, in the absence thereof he was unwilling to be bound thereunder. Even assuming *arguendo* that "equality of obligation" was a benefit derived from the conditional nature of the loan, we conclude that Nanula's argument that he was deprived of this benefit is without merit.

As an initial matter, we note that the reasonableness of Nanula's alleged expectation that Continental would strictly enforce the provision requiring that all WBLP limited partners execute assumption agreements is questionable at best. At the time Nanula signed his assumption agreement, he was in possession of a loan commitment letter, dated September 15, 1982, in which Continental detailed its obligations to disburse the loan to WBLP. Paragraph 5 of the commitment letter provides, in relevant part:

> "Our commitment assumes, of course, 100% coverage of the term loan by the Assumption Agreements referred to ... above. *To the extent that the partnership has any 'dissident' limited partners at the time of loan closing (whether by failure to sign an acceptable Assumption Agreement or by default in the payment of previous capital calls), the $16,575,000 loan amount would be proportionately reduced* or some other mutually acceptable solution would need to be worked out."

(Emphasis added). Thus, Nanula was on notice that Continental could disburse the loan—albeit in a lesser amount—without obtaining assumption agreements from all WBLP limited partners. In fact, this is exactly the course of action taken by Continental. After failing to receive assumption agreements from three Type A limited partners, Continental proportionately reduced its funding of the loan by $\frac{3}{99}$ths (or $502,273). As noted above, this portion of the loan was funded through the participation of Equitable, based on its previous loan to the partnership. Throughout his brief, Nanula ignores Equitable's $\frac{3}{99}$ths participation in the loan, which is not surprising (although disingenuous in our opinion) in light of the fact that it belies his argument that he was divested of his alleged benefit of "equality of obligation" through Continental's failure to obtain assumption agreements from each Type A limited partner.

Unlike Nanula and the other limited partners executing Continental assumption agreements, the three limited partners failing to guarantee the Continental loan remained liable under assumption agreements obligating them to assume a pro rata portion of the Equitable loan. By virtue of Equitable's $\frac{3}{99}$ths participation, these limited partners became, in effect, guarantors of the Continental loan. That is, $\frac{96}{99}$ths of the $16,575,000 loan was secured by Continental assumption agreements. The remaining $\frac{3}{99}$ths, representing Equitable's participation in the loan, was secured through Equitable assumption agreements. In addition, because the three limited partners failing to execute Continental assumption agreements remained liable under the Equitable assumption agreements, they were obligated to continue making additional capital contributions if and when the general partner requested them to do so.[10] Thus, because we are unpersuaded by this argument, we reject Nanula's legal theory that Continental's disbursement of the partnership loan with-

---

**10.** As the district court found in its order of July 21, 1988:

> "Under paragraph 6.04 of the Partnership Agreement, defendant further agreed to make additional capital contributions if and when needed to enable the partnership to pay current debt service on its long-term financing. All such payments of additional capital were deemed to be payments under both the Assumption Agreement and the Promissory Note. Paragraph 12.02 of the Partnership Agreement provides that defendant's total liability for the Partnership's debts and losses is limited to his initial cash payment and his obligations under the Subscription Note, Promissory Note, and Assumption Agreements."

*Federal Deposit Ins. Corp. v. Nanula*, No. 87–C–4690, slip op. at 2, 1988 WL 79666 (N.D.Ill. July 21, 1988). Thus, under paragraph 6.04, the limited partners refusing to guarantee the Continental loan remained liable for additional capital contributions until their obligations under their Equitable assumption agreements had been fulfilled.

out obtaining Continental assumption agreements from all Type A limited partners deprived him of the so-called benefit of "equality of obligation" among the limited partners. Nanula's risk under his assumption agreement was not affected by the loan being disbursed under these circumstances. *Compare Cirivello*, 24 Ill. Dec. at 842–43, 386 N.E.2d at 46–47. Further, Nanula accepted the benefits flowing from the issuance of the loan—namely, release from his Equitable assumption agreement and tax deductions for being "at risk" on the Continental loan[11]—without complaining that Continental had failed to obtain assumption agreements from three of the limited partners, despite the fact that WBLP informed him in a letter, dated February 1, 1983, that the loan "closed with the participation of 96 out of 99 units." Thus, we reject Nanula's attempt to avoid his obligations under the Continental assumption agreement on this ground. *Cf. Lawndale Steel Co. v. Appel*, 98 Ill. App.3d 167, 53 Ill.Dec. 288, 292, 423 N.E.2d 957, 961 (1981).

### III.

■ Nanula next contends that the district court erred in finding that the FDIC is entitled to recover $56,100, representing Nanula's $51,000 liability for unpaid capital contributions and $5,100 in prejudgment interest under Count II of the complaint. Specifically, Nanula disagrees with the district court's award of prejudgment interest and states that it is erroneous because it represents the interest accruing on $51,000 from November 13, 1986, the date the general partner made written demand for Nanula's unpaid capital contributions, to November 2, 1988, the date the district court entered summary judgment for the FDIC on the issue of damages. According to Nanula, no interest should have accrued after January 27, 1987, because on that date, the FDIC received $5,879,162.30 in assets from WBLP which formed the basis

for the $54,425.91 credit the district court applied to Nanula's total liability to the FDIC. Nanula claims that the $54,425.91 credit completely extinguished his $51,000 debt for unpaid capital contributions and the interest accruing thereon prior to January 27, 1987, and that, as a result, there was no outstanding debt after that date upon which further interest could accrue. The FDIC contends that Nanula's argument is based on a misinterpretation of the agreement under which the FDIC received the partnership assets from WBLP ("FDIC Agreement"). Upon review of the FDIC Agreement, we agree.

Section 8(b) of the FDIC Agreement provides that "[t]he FDIC will credit each Nonconsenting Limited Partner with his or her Pro Rata share of the net FDIC receipts," and, further, that "[t]he FDIC and the PARTNERSHIP agree that the net FDIC receipts shall be applied ... to any Unpaid Capital Contributions of each Nonconsenting Limited Partner plus interest at the appropriate rate, until all such Unpaid Capital Contributions are paid in full." "Net FDIC receipts" is defined in section 8(b) as the difference between the value of WBLP assets received by the FDIC and "any and all expenses the FDIC has incurred under or pursuant to the Loan Agreement or this Agreement, including the reasonable attorneys' fees, expenses and disbursements incurred by the FDIC in negotiating this Agreement [or] consummating the settlement...."

Nanula's argument, essentially, is that under section 8(b) of the FDIC Agreement, he was entitled to have a credit based on his pro rata share (1/99th) of "net FDIC receipts" applied against his outstanding liability to the FDIC on the date that the FDIC received the assets, January 27, 1987. At the outset, we note that section 8(d) of the FDIC Agreement provides: "Nothing in this paragraph shall be deemed to confer any rights whatsoever

---

**11.** It is undisputed that between 1982 and 1986, Nanula reported income tax deductions based on WBLP losses totalling approximately $270,000, although Nanula had contributed only $134,500 to the Partnership. This was permissi-

ble only if Nanula was "at risk" for his share of WBLP's liabilities in the amount by which his claimed losses exceeded his capital contributions. *See* 26 U.S.C. § 465.

upon any Nonconsenting Limited Partner, ... except as otherwise set forth in this Agreement...." From our review of the FDIC Agreement, we are unable to discover any provision therein delineating the date on which "Nonconsenting Limited Partners" such as Nanula were entitled to have their credit applied to their outstanding debts to the FDIC. In any event, Nanula's argument completely ignores the fact that under section 8(b), "net FDIC receipts" are calculated only after reducing the value of the WBLP assets received by attorneys' fees and other expenses associated with effectuating the loan and the FDIC Agreement. It is undisputed that the FDIC incurred costs well beyond January 27, 1987, thus preventing the FDIC from determining "net FDIC receipts" and, consequently, Nanula's credit based on a pro rata share thereof on that date. It is axiomatic that if the FDIC could not ascertain Nanula's "credit" on January 27, 1987, the credit could not be applied against his outstanding liability to the FDIC on that date. In light of the fact that the FDIC was unable to determine and apply Nanula's credit on January 27, 1987, it necessarily follows that Nanula's $51,000 debt for unpaid capital contributions was not extinguished on that date and that interest continued to accrue until such time as the FDIC could ascertain "net FDIC receipts."[12] Thus, we reject Nanula's contention that the FDIC is not entitled to recover prejudgment interest accruing after January 27, 1987, and affirm the district court's finding that Nanula's liability under Count II of the complaint was $56,100 subject to an offset of $54,425.91 based on the FDIC's receipt of assets from WBLP.

## IV.

Nanula's challenges to the district court's grant of summary judgment in favor of the FDIC are without merit. The district court properly determined that Na-

nula's Continental assumption agreement was not conditioned on the execution of similar agreements by the other Type A limited partners. Even if it was, the condition was solely for Continental's benefit, and the waiver of the condition in no way affected Nanula's risk. Thus, the FDIC is entitled to recover $146,871.10 under Count I, representing Nanula's pro rata share of the Continental loan. The FDIC is also entitled to recover $56,100, subject to an offset of $54,425.91, under Count II based on Nanula's liability for unpaid capital contributions and the interest accruing thereon. Nanula's argument that the FDIC's receipt of assets which formed the basis for the $54,425.91 credit extinguished his debt for unpaid capital contributions plus interest is based on a misreading of the agreement under which the FDIC obtained the assets. Accordingly, the district court's grant of summary judgment in favor of the FDIC for $148,545.19 is

AFFIRMED.

---

12. We note that the FDIC, in order to expedite resolution of this case, arrived at the $54,425.91 figure by calculating the credit due Nanula based on expenses incurred as of July 31, 1988, despite the fact that the costs of litigating this case continued to accrue after that date. Thus, it is apparent that the FDIC provided Nanula with a credit larger than that to which he was entitled under section 8(b) of the FDIC Agreement.