F I L E D
United States Court of Appeals
Tenth Circuit

JUN 17 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

In re:  VILLA WEST ASSOCIATES,

Debtor.

_____

DARCY D. WILLIAMSON, Trustee,

Plaintiff - Appellee,

v.

FRED C. KAY,

Defendant - Third-Party-
Plaintiff - Appellant,

v.

THOMAS W. VANDYKE; LESLIE M.
BURNES; KIRK W. CARPENTER;
PAUL R. VIRDEN; BERNARD
HAINEN; E. JEROME HANSON, M.D.;
C. THOMAS HITCHCOCK, M.D.;
JERRY WARDEN; JAMES C.
BRENNEMAN; STEVEN R. DUVALL;
JUDE NALLY; H. ELVIN KNIGHT, JR.;
L. KENNETH HUBBELL; JOHN A.
ALHOLM; DON C. FREBURG,

Third-Party-Defendants -
Appellees,

Nos. 96-3133
and 96-3425

DOUGLAS KAY and ANN KAY,

    Third-Party-Defendants - Appellants,

MN ASSOCIATES,

    Claimant - Appellee.

---

In re: VILLA WEST ASSOCIATES,

    Debtor.

---

DARCY D. WILLIAMSON, Trustee,

    Plaintiff - Appellee,

    v.

FRED C. KAY,

    Third-Party-Plaintiff - Appellant,

    v.

JOHN A. ALHOLM; L. KENNETH HUBBELL; THOMAS W. VANDYKE; DON C. FREBURG; BERNARD HAINEN; C. THOMAS HITCHCOCK; KIRK W. CARPENTER; H. ELVIN KNIGHT, JR.; PAUL VIRDEN; JAMES C. BRENNEMAN; E. JEROME HANSON; LESLIE M. BURNS; JERRY WARDEN; JAMES L. GLASSER; MN

No. 96-3135

-2-

ASSOCIATES; GLENDA HAINEN;
DONNA NALLY; JAMES C. GLASSER,

        Third-Party-Defendants -
        Appellees,

DOUGLAS KAY and ANN KAY,

        Third-Party-Defendants -
        Appellants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NOS. 91-4044-SAC and 95-4089-RDR)**

---

Cynthia L. Reams, Weisenfels & Vaughan, Kansas City, Missouri (Jan Hamilton, Hamilton, Peterson, Tipton & Keeshan, Topeka, Kansas, with her on the briefs), for Defendant - Third-Party-Plaintiff - Appellant and Third-Party-Defendants - Cross-Claimants - Appellants.

Robert J. Bjerg, Seigfreid, Bingham, Levy, Selzer & Gee, P.C., Kansas City, Missouri, for Third-Party- Defendants - Appellees.

Patricia A. Reeder, Woner, Glenn, Reeder & Girard, Topeka, Kansas, for Plaintiff - Appellee.

---

Before **ANDERSON**, **EBEL**, and **KELLY**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

This consolidated appeal arises from an adversary proceeding brought in the bankruptcy of Villa West Associates, a Kansas limited partnership. ("Villa West" or "Partnership"). The first issue we must determine is whether the provision in the Villa West limited partnership agreement that governs calls for additional capital contributions allows the general partner, on behalf of the Partnership, to bring a suit for money damages against a limited partner who fails to contribute when a call is made. The bankruptcy court found that, because the obligation to contribute is mandatory, any limited partner who fails to contribute is liable for money damages. Appellants' App., Tab 10 at 106-12. The district court reversed, finding, *inter alia*, that the limited partnership agreement set forth the agreed-upon remedies in the event of a default, and that a money damages suit was not one of the listed remedies. Id., Tab 16 at 422. For the reasons set forth below, we agree with the district court. The second issue we address is whether, under Kansas law, the limited partners owed a fiduciary duty to one another in the circumstances of this case. The bankruptcy court found that such a duty existed, and that the appellees had breached that duty. The district court reversed. Again, we agree with the district court. Finally on the third issue, whether the district court erred in assessing $2,612.50 in attorneys fees as sanctions against the

appellants for filing a second premature appeal, we conclude that there is no reversible error.

## BACKGROUND

Both the bankruptcy court and the district court have exhaustively set forth the undisputed facts surrounding this nearly nine-year-old litigation. We summarize as follows. The Partnership was formed in 1983 to purchase and operate a shopping center in Topeka, Kansas. It was designed as a tax shelter, which, under then-existing tax laws, would permit an individual limited partner to claim against his or her individual income a share of the Partnership losses, up to the amount the respective limited partner was "at risk." Appellants' Br. at 13, 15; Appellees' Br. at 2; see I.R.C. §§ 465, 752.[1] The general partner was Fred C. Kay ("F. Kay"), who also held a limited partnership interest. Ultimately, there were eighteen limited partners, including F. Kay, and his parents, Doug and Ann Kay ("D. & A. Kay"). The limited partners' interests varied, depending upon the number of partnership units purchased.

At the time of investment, each limited partner signed both a subscription agreement for a specified share of the Partnership and a combined signature page

---

[1]Unless otherwise specified, all citations to the Internal Revenue Code refer to the provisions which were in effect at the time the partnership was created.

and participation agreement. These were delivered to F. Kay, together with the limited partner's check in half payment of the initial capital contribution and an executed recourse promissory note for the subscription balance. At the same time, each limited partner also executed a continuing guarantee, capped at 125% of the limited partner's interest in the Partnership, in favor of Metro North State Bank ("Metro Bank") as security for two promissory notes made by the Partnership and payable to Metro Bank (the "Notes"), in the respective amounts of $300,000.00 and $225,000.00. Both Notes were recourse notes as to the Partnership and were signed by F. Kay as general partner. Appellants' Br. at 14.

The limited partnership agreement authorized F. Kay to demand additional capital contributions from the limited partners under certain conditions. Appellees' Br. at 16, 32. In particular, Paragraph 9 of the partnership agreement addressed the partners' ability to deduct Partnership losses by referencing a "risk" for Partnership debts through conditional provisions for Additional Capital Contributions to the Partnership to fund operating deficits. Appellants' Br. at 15; Appellees' Br. at 2; see I.R.C. §§ 465, 752.

By 1987, the partnership was in serious financial straits. Pursuant to paragraph 9, on November 9, 1987, F. Kay wrote to the limited partners demanding additional capital contributions totaling $150,000 to cover an existing operating deficit. None of the limited partners honored the call, and, apparently,

-6-

F. Kay did nothing. Appellants' Br. at 16; Appellants' App., Tab 49 at 1050-59. On March 17, 1988, F. Kay again wrote the limited partners, advising that additional substantial capital contributions would be necessary to avoid foreclosure. Again, no partner contributed; F. Kay apparently did nothing. Finally, unable to raise the needed funds, F. Kay, sought bankruptcy protection for the Partnership under Chapter 11. Eventually, the mortgagee of the shopping center foreclosed on its nonrecourse loan. Additionally, the two Notes given by the Partnership to Metro Bank, and guaranteed by the limited partners, went into default, and Metro Bank demanded payment in full.

At that time, unbeknown to F. Kay and D. & A. Kay, all the other limited partner/Note guarantors formed a separate partnership, MN Associates (the "Note partnership" or "Note partners"), which purchased the Notes from Metro Bank for $541,669.18. As assignee of the Notes, they then demanded full payment from F. Kay as general partner, and from D. & A. Kay, to the extent of their guarantees, and they also filed a proof of claim against the Partnership in the bankruptcy court. After receiving the Note partners' demand, on March 24, 1989, F. Kay again called upon all limited partners for an additional capital contribution, this time to cover that demand. None of the limited partners honored the call. The bankruptcy was converted to Chapter 7, a Trustee was appointed, and this adversary proceeding ensued.

The issues in this case present an all or nothing approach by the parties. According to F. Kay's reading of the partnership agreement, he would never be subjected to any general partner liability for the Notes so long as the limited partners had any money, because he could simply call for additional capital from the limited partners to pay the Partnership's obligation on the Notes. On the other hand, under the limited partners' approach, their guarantees on the Notes are meaningless so long as either the partnership or the general partner had any money. They could either buy the Notes outright, or, as guarantors, subrogate with respect to any demand by the bank on their guarantees. Either tactic would allow them to seek full payment from the primary obligor, the partnership, and in turn the general partner, and under the terms of the partnership agreement escape liability to the Partnership or the general partner.

## DISCUSSION

On appeal from a district court's decision in its capacity as bankruptcy appellate court, we independently review the bankruptcy court's decision, applying a "clearly erroneous" standard to bankruptcy court's findings of fact and a "de novo" standard to its conclusions of law. Phillips v. White (In re White), 25 F.3d 931, 933 (10th Cir. 1994).

A.  Relevant Provisions of the Partnership Agreement

A limited partnership agreement constitutes a contract between the parties. See Beverly v. McCullick, 505 P.2d 624, 632 (Kan. 1973).  If a contract is unambiguous, its construction and interpretation presents a question of law which we review de novo.  Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342, 1345 (10th Cir. 1992); see Sunflower Park Apartments v. Johnson, 937 P.2d 21, 23 (Kan. Ct. App. 1997).  In this case, although the parties interpret its provisions differently, they both argue that the partnership agreement is unambiguous, and they generally base their legal positions upon Paragraphs 9 and 14(c).[2]

Paragraph 9, which F. Kay invoked when he made the calls for additional capital contributions, provides as follows:

> Additional Capital Contributions.  In any year in which the Partnership incurs operating deficits,[3] and funds for the payment thereof are not available and cannot be borrowed on terms acceptable to the General Partner, then each partner, general or limited, shall be required to contribute his proportionate share of such deficit as an additional capital contribution (determined in accordance with the percentages for the division of profits and losses provided in Paragraph 8 hereof, as subsequently modified by any other provisions

---

[2]The Note partners also contend that Paragraph 10 applies.  Inasmuch as we determine that the limited partner's have no personal liability for additional capital calls on the bases of Paragraphs 9 and 14, we neither set out Paragraph 10 nor discuss our conclusion that the paragraph is inapplicable to this case.

[3]Despite the Note partners' belated and persuasive argument respecting this term, our thorough review of the record before the bankruptcy court convinces us that the Note partners did not timely raise any argument as to the meaning of the term operating deficit as used in this paragraph.

in this Agreement) in an amount not to exceed his proportionate share of the excess of operating expenses and mortgage payments over gross revenues from the property.  <u>In the event any partner fails to make any such required contribution within thirty (30) days</u> following the receipt of written notice of the requirement to make such a contribution, <u>such partner shall be deemed in default and the remaining Limited Partners shall have the right to make such additional capital contribution pro rata and thereby increase their percentage interests in the capital of the partnership.  In the event all Limited Partners have declined to provide all or any portion of such additional capital, then notwithstanding anything to the contrary herein contained, the General Partner is authorized to admit additional Limited Partners as necessary to raise the additional capital.</u>  The percentage interests in the capital and profits and losses of the Partnership shall be adjusted to reflect such additional cash capital contributions of the existing Partners and the admission and cash capital contributions of any Limited Partners to be added.

Appellants' App., Tab 50 at 1165 (emphasis added).

Additionally, paragraph 14(c) provides as follows:

<u>Management, Duties and Restrictions.</u>
(c) <u>Limited Partners.</u>  No Limited Partner shall participate in the management of the partnership business.  No Limited Partner or General Partner shall have the right to withdraw his capital contribution.  Except as otherwise provided in Paragraph 22 hereof, no Limited Partner shall have the right to demand or receive property other than cash in return for his interest in the Partnership.  No Limited Partner shall have priority over any other Limited Partner.  <u>No Limited Partner shall be personally liable for any of the debts of the Limited Partnership or any of the losses thereof beyond the amount committed by him to the capital of the Limited Partnership</u> and his share of undistributed profits of the Limited Partnership.

<u>Id.</u> at 1169 (emphasis added).

B. Limited Partnership Agreements and Liability for Additional Contributions

The Kays argue that the district court erred in finding that the partnership agreement provided an exclusive remedy of dilution or forfeiture in the event that a limited partner failed to make a capital contribution when required to do so under Paragraph 9 of the limited partnership agreement. The Note partners respond that any reading of the limited partnership agreement which would subject them to suit for failure to make additional contributions is inconsistent with the concept of being a limited partner.[4]

"The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." Ryco Packaging Corp. v. Chapelle Int'l, Ltd., 926 P.2d 669, 674 (Kan. Ct. App. 1996) (citing Hollenbeck v. Household Bank, 829 P.2d 903, 906 (Kan. 1992)). Where two or more instruments are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter, they will be read and construed together to determine the intent, rights, and interests of the parties. Akandas, Inc. v. Klippel, 827 P.2d 37, 51 (Kan. 1992). "Reasonable rather than unreasonable interpretations of contracts

_____

[4]In their reply brief, the Kays further contend that the Note partners have conceded their liability on pages 16 and 32 of their Appellees' Brief. However, we interpret the Note partners' statements to concede only the general partner's authority to make calls; nowhere do they concede their personal liability upon failure to honor the calls.

are favored," and "'[r]esults which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided.'" Kansas State Bank & Trust Co. v. DeLorean, 640 P.2d 343, 349 (Kan. Ct. App. 1982) (quoting Weiner v. Wilshire Oil Co., 389 P.2d 803, 808 (Kan. 1964)). "Kansas follows the traditional rule that parties who are mentally competent may contract on their own terms unless the contract is illegal, contrary to public policy, or obtained by fraud, mistake, overreaching, or duress." Hartford v. Tanner, 910 P.2d 872, 878 (Kan. Ct. App. 1996). A party who has voluntarily entered into a contract is bound by its terms, even though the contract may prove to be unwise or disadvantageous to him. Corral v. Rollins Protective Servs. Co., 732 P.2d 1260, 1263 (Kan. 1987).

1. Specific Statutory Authorization as to Limited Partner's Liability for Agreements to Make Future Contributions and Villa West's Tax Shelter Design

The Kays contend that Paragraph 9 of the partnership agreement constitutes a promise to make additional contributions which is enforceable under Kansas law. In support they cite Kan. Stat. Ann. § 56-1a302 which provides that a limited partner is obligated to the partnership for his written promises to contribute as follows:

> Liability for contributions. (a) No promise by a limited partner to contribute to the limited partnership is enforceable unless set out in a writing signed by the limited partner.

> (b) Except as provided in the partnership agreement, a partner is obligated to the limited partnership to perform any enforceable promise to

-12-

contribute **cash** or property or to perform services, even if the partner is unable to perform because of death, disability or any other reason. . . .

(c) Unless otherwise provided in the partnership agreement, the obligation of a partner to make a contribution . . . may be compromised only by consent of all the partners. Notwithstanding the compromise, a creditor of a limited partnership who extends credit to the partnership may enforce the original obligation if the creditor extends credit . . . after the filing of the certificate of limited partnership . . . which . . . reflects the obligation, and before [any] amendment . . . reflect[ing] the compromise.

Id. (emphasis added). Thus, the Kays argue that Kansas law specifically contemplates agreements which obligate limited partners to make future contributions and also permits the partnership to sue a limited partner who fails to make those promised contributions. We agree. However, the cited provision of Kansas law also makes it clear that the language of the particular partnership agreement will determine whether such an obligation and remedy are in fact created.

In this case, the Kays argue that the language is clear, but they further contend that the Partnership's tax sheltering purpose informs the partnership provisions and unequivocally establishes the Note partners' personal liability for calls related to the Notes. The Kays are correct in their assertion that, in order to qualify for a pass-through deduction at the time that the Partnership was formed, the relevant tax laws required a limited partner to be "at risk", *i.e.*, the limited partner had to assume personal and ultimate liability for certain debts. See Pritchett v. Commissioner, 827 F.2d 644, 646-47 (9th Cir. 1987) (finding that

-13-

limited partner's obligation to make additional capital contributions under the partnership agreement satisfied the "at risk" requirement of I.R.C. § 465); Gefen v. Commissioner, 87 T.C. 1471, 1499-1502 (1986) (same, both under I.R.C. § 465 and under § 752); cf. Goatcher v. United States, 944 F.2d 747, 750 (10th Cir. 1991) (finding that taxpayers, subchapter S shareholders, as mere guarantors of debt to corporation, were not "at risk," and therefore not entitled to deductions).[5]

In fact, in the context of tax shelters, there are abundant examples of limited partnership agreements which contain additional assessment clauses that have been held to be enforceable. See, e.g., Dayton Sec. Assoc. v. Securities Group 1980 (In re Sec. Group 1980), 74 F.3d 1103, 1105-06 (11th Cir. 1996) (allowing bankruptcy trustee to sue limited partners in tax shelter based upon provision for additional contributions to cover specified recourse indebtedness up

---

[5]In a slightly different context, Goatcher concerned the "at risk" requirements of I.R.C. § 465, and we observe that, when the Villa West Partnership was formed, the § 465 "at risk" rules did not apply to nonrecourse debt involved in real estate activities. See former I.R.C. § 465(c)(3)(D) (deleted by the Tax Reform Act of 1986, Pub. L. 99-514). Significantly, however, the Notes represent recourse, rather than nonrecourse debt. Therefore, pass-through deductibility of the liability is governed by I.R.C. § 752, which had requirements similar to § 465 respecting ultimate personal liability. See Gefen v Commissioner, 87 T.C. 1471, 1499 (1986); Abramson v. Commissioner, 86 T.C. 360, 374 (1986); see also Arthur Kalish & Jeffrey J. Rosen, The Risky Basis for Partnership Allocations, 38 Tax Law. 119, 128, 131 (1984) (noting that Treasury Reg. § 1.752-1(e) "treat[s] a limited partner like a general partner to the extent that he too can be obligated to use his personal assets to satisfy a partnership liability," and that "the key to a limited partner's share of recourse liabilities is his obligation to make additional contributions to the capital of the partnership").

to three times limited partner's original investment); <u>Federal Deposit Ins. Corp. v. Nanula</u>, 898 F.2d 545, 551-52 n.10 (7th Cir. 1990) (allowing creditor to recover from limited partner in tax shelter based on provision to make additional contributions to cover obligations of specified notes and assumption agreements); <u>Continental Illinois Nat'l Bank & Trust Co. v. Allen</u>, 811 P.2d 168, 172-73 (Utah 1991) (allowing creditor to enforce limited partner's obligation to contribute additional capital to satisfy specifically referenced guarantee); <u>Coventry Manor Phase II Assoc., L.P. v. Hainen</u>, 904 S.W.2d 279, 282-83 (Mo. Ct. App. W.D. 1995) (interpreting language identical to Villa West agreement, and holding that obligation to contribute was mandatory upon general partner's call); <u>Contraband Cove v. Daly</u>, 527 So. 2d 534, 535, 537 (La. Ct. App. 3d Cir. 1988) (construing obligation to pay installments on initial subscription, noting that agreement specifically provided that general partner would have no obligation to make up any deficiency, and finding paragraph setting forth penalties both as to subscription installments and additional contributions to be nonexclusive).

Faced with such examples, we conclude that certain business and tax considerations may induce a limited partner to enter into agreements which expand his or her otherwise limited liability. Significantly, however, all of the examples we discovered, except <u>Coventry Manor</u>, involve provisions which expressly specified the amount to be contributed, or which set caps on the

-15-

contribution requirements, or which specified the particular partnership debt for which the limited partner assumed liability. Nonetheless, we accept the Kays' contention that in order to be "at risk," so as to qualify for the related pass-through deductions which they claimed, the Villa West limited partners needed to unconditionally obligate themselves to make additional capital contributions to cover their proportionate share of losses and expenses associated with the Notes.

### 2. Interpretation of Villa West Partnership Agreement

Having concluded that a limited partner's agreement to make additional capital contributions to cover certain indebtedness is entirely consistent with Kansas law and policy, as well as then-existing tax considerations, we now determine whether the Villa West partnership agreement did in fact include an unconditional promise that the limited partners would make additional contributions.

a. Paragraph 9. According to Paragraph 9, "[i]n any year in which the Partnership incurs operating deficits," each limited partner "shall be required to contribute his proportionate share of such deficit," and if "any partner fails to make any such required contribution . . . such partner shall be deemed in default." Appellants' App., Tab 50 at 1165 (emphasis added). The remainder of the paragraph grants the other limited partners the right to make pro rata additional contributions due from the defaulting partner(s), which contributions

-16-

will increase the interests of those partners who step in. If the limited partners decline to step in for the defaulting partner's obligation, the general partner is authorized to admit additional limited partners. <u>Id.</u>

We agree with the bankruptcy court's implicit conclusion that a contract need not expressly set forth common law remedies for default, and we also agree with its finding that Paragraph 9 created a mandatory duty to contribute. However, we disagree that, in this case, a default triggered liabilities or penalties beyond those expressly listed in the paragraph itself. To the contrary, we read Paragraph 9 as a single, integrated unit which plainly sets out the consequences of a limited partner's default of his mandatory duty to contribute. That is, the paragraph specifies the agreed-upon penalty—the limited partner faces dilution of his partnership interest if he chooses not to make additional contributions in the face of increasing capital costs. The fact that an action at law for money damages is a standard breach of contract remedy does not compel us to interpolate it here. Rather, Paragraph 9 is complete as written, and an action for money damages would be inconsistent with its express provisions. In this case, such a reading

comports with the clear language of the paragraph[6] and is also consistent with our reading of Paragraph 14(c).

        b. <u>Paragraph 14(c).</u> Paragraph 14(c) states that "[n]o Limited Partner shall be personally liable for any of the debts of the Limited Partnership or any of the losses thereof <u>beyond the amount committed by him to the capital of the Limited Partnership</u>." Appellants' App., Tab 50 at 1170 (emphasis added). According to the Kays, that limitation takes into account and includes all the indeterminate amounts which the limited partners agreed to contribute under Paragraph 9.[7] We disagree.

---

[6]In a different context, we might be inclined to find the contract ambiguous. However, in this case as we have mentioned above, the parties have stipulated that the contract is unambiguous and have argued that it must be interpreted according to its clear language. Although the language could be clearer, we have no problem finding that, even if the parties may have had other intentions, the contract as written simply does not provide for the open-ended liability which F. Kay asserts against the limited partners. <u>See</u> discussion of Paragraph 14(c) *infra*. Moreover, under Kansas law, if there were any doubtful terms, they would have to be construed against the Partnership as drafter of the document. <u>Metropolitan Life Ins. Co. v. Strnad</u>, 876 P.2d 1362, 1366 (Kan. 1994). Likewise, if any ambiguity existed, the maxim *expressio unius est exclusio alterius*—the mention or inclusion of one thing implies the exclusion of another, would dictate the same result we reach by interpreting the contract's plain language. <u>Id.</u>

[7]The Kays attempt to discredit the limited partners' argument that such a reading essentially converts the limited partners into general partners. Thus, the Kays note that in any event, the limited partners are not liable to third party creditors. Appellants' Br. at 38. We disagree. As noted previously, Kan. Stat. Ann. § 56-1a302(c) expressly permits a creditor to enforce a limited partners' promise to contribute. <u>See</u> quoted statute and cases cited, *supra*, discussion section B.1.

The phrase "amount committed" suggests a finite, quantifiable sum, and, in any event, the Kays' contrary argument makes the sentence either absurd or meaningless. That is, the Kays' argument bootstraps the "amount committed" limitation in Paragraph 14(c) to their contention that Paragraph 9 makes the limited partners liable for <u>any</u> negative cash flow which the general partner cannot finance. <u>See</u> Appellants' Br. at 28. Thus, according to the Kays, the paragraphs must be read in conjunction—even though Paragraph 14(c) clearly purports to express a limitation of liability, it actually means that the limited partners shall be personally liable for their share of all unpaid debts and losses which the Partnership could not pay under Paragraph 9. In other words, Paragraph 14(c) sets no limit on liability. As previously noted, Kansas law favors reasonable rather than unreasonable interpretations of contracts, and it avoids results which reduce the terms of a contract to an absurdity. <u>DeLorean</u>, 640 P.2d at 349. Thus, we decline to construe Paragraph 14(c) so as to render it meaningless or absurd.

Accordingly, we conclude that Paragraph 14(c) limits personal liability to the amount of the original subscription, and this limitation necessarily informs and buttresses our interpretation of Paragraph 9.[8]

---

[8]Consequently, despite the limited partners' desire to qualify for certain tax benefits respecting the Notes, the form they chose may be problematic on that point. <u>See</u>

(continued...)

-19-

C. Fiduciary Duty

D. & A. Kay contend that the district court erred in finding that the Villa West limited partners who formed the Note partnership did not owe them a fiduciary duty. Essentially, D. & A. Kay argue that the principles by which general partners are held to a fiduciary duty should also apply to limited partners, and they also cite cases which have found certain limited partners to have owed a fiduciary duty to the other partners. The Note partners concede that a general partner owes a fiduciary duty to the partnership and his partners. However, they dispute that the same principles apply to limited partners. Additionally, they distinguish the cases cited by D. & A. Kay on the basis that those cases involve instances in which the limited partner 1) exercised control over the partnership; 2) had an otherwise confidential relationship (such as attorney); or 3) acted in concert with the general partner.

Whether a fiduciary duty exists is a question of law which we review de novo. See Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996). Kansas courts have not directly addressed the issue of whether a limited partner owes fellow limited partners a fiduciary duty. However, the cases have clearly set forth what criteria must exist in order to establish a fiduciary

---

[8](...continued)
Goatcher, 944 F.2d at 752 (refusing to disregard the form of the transaction so as to allow the desired tax benefit).

-20-

relationship. <u>Gillespie v. Seymour</u>, 796 P.2d 1060 (Kan. Ct. App. 1990), <u>rev'd in part on other grounds</u>, 823 P.2d 782 (Kan. 1991), recites the necessary elements:

> "It has been recognized that a fiduciary relationship between parties does not depend upon some technical relation created by, or defined in, law. It exists in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard for the interests of the one reposing the confidence. [Citations omitted.]
>
> "Fiduciary relationships recognized and enforceable in equity do not depend upon nomenclature; nor are they necessarily the product of any particular legal relationship. [Citations omitted.] They may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties. [Citations omitted.] But they necessarily spring from an attitude of trust and confidence and are based upon some form of agreement, either expressed or implied, from which it can be said the minds have met in a manner to create mutual obligations. [Citations omitted.]
>
> "For the plainest of reasons, agreements establishing fiduciary relationships, if not in writing, must be clear and convincing. Because of the acuteness of the equitable remedies, courts will not reach out to establish legal relationships from which enforceable equitable rights may flow. A confidential relationship is never presumed, and the burden of proof is upon the party asserting it. [Citation omitted.]
>
> "Mere concert of action, without more, does not establish a fiduciary relationship. [Citations omitted.] Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises."

<u>Id.</u> at 1063 (quoting <u>Paul v. Smith</u>, 380 P.2d 421, 426 (1963)).

Summarizing the relevant considerations, the Gillespie court concluded that a "fiduciary relationship requires confidence of one in another and a certain inequity or dependence arising from weakness of age, mental strength, business intelligence, knowledge of facts involved, or other conditions which give one an advantage over the other." Id.

In this case, D. & A. Kay neither alleged nor presented facts which support a conclusion that they were in a position of inequity or dependence vis à vis the Note partners.[9] Furthermore, D. & A. Kay failed to present facts sufficient to support a finding that the Note partners, either individually, or acting as a dominant group, held a position of confidence with,[10] or exercised control over, the Partnership at any relevant time. Cf. Southern Pac. Co. v. Bogert, 250 U.S. 483, 491 (1919) (finding that when majority stockholders act so as to exercise

_____

[9]Neither party has favored us with any explanation, either as to any disadvantages that D. & A Kay faced by reason of the Note partners' tactic, or as to any advantages the Note partners sought to gain by excluding them. In any event, the Note partners have had to expend funds to cover the portion of the Notes that represent the obligation of D. & A. Kay under the guarantees, and D. & A. Kay will have rights of subrogation against F. Kay.

[10]At trial, F. Kay stated that one of the Note partners had been the attorney for the Partnership when it was formed and had drafted the partnership documents. However, nothing in the record suggests that the attorney-client relationship continued beyond the initial formation. See Appellants' App., Tab 52 at 1300, 1379. Also, F. Kay testified that another of the Note partners was the real estate broker who initially brought the Villa West shopping center to his attention, provided an economic analysis of the property, and assisted in obtaining the original financing. Id. at 1299-1300, 1329. However, nothing in the record suggests that the broker continued to act for the Partnership in any confidential or agent/principal capacity.

-22-

control over the corporation, they stand in a fiduciary relationship with the corporation and the minority shareholders).

Under the circumstances, D. & A. Kay's bare allegation that a fiduciary duty exists fails. Accordingly, we agree with the district court's conclusion that the bankruptcy court erred in holding that the Note partners owed a fiduciary duty to D. & A. Kay.

D. Appellate Sanctions

As their final claim of error, the Kays contend that the district court lacked jurisdiction to determine sanctions pursuant to our remand following the Kays' second appeal. Alternatively, the Kays contend that the imposition of sanctions is contrary to Tenth Circuit law. We disagree.

In relevant part Tenth Circuit Rule 46.5 provides that this court "may impose . . . an appropriate sanction" upon parties who make improper filings. In connection with the Kays' first appeal, we issued a detailed order which fully explained our reasons for finding that we lacked jurisdiction. Appellants' App., Tab 20. Although nothing had occurred to change the conclusion based upon that reasoning, the Kays filed a second appeal prior to the time that the matters had been fully adjudicated below. Moreover, almost contemporaneously with their appeal, the Kays filed a motion to dismiss their own appeal, noting that "Appellants do not, in their best judgment, and on review of the applicable law,

-23-

believe this Court to have jurisdiction at this time over their Appeal." Appellants' App., Tab 32 at 516. Following our order for briefing, the Kays further stated that "[i]t seems elementary that since the remanded matters now determined by the Bankruptcy Court have themselves result[ed] in an appeal to the District Court, th[e]n the Judgment is still not ripe for appeal to the 10th Circuit." Id., Tab 34 at 531.

Filings which are not warranted by existing law or a good faith argument for the extension or modification of such law waste the resources both of this court and the parties. Accordingly, in response to the Note partners' motion for costs, including reasonable attorney fees under Tenth Circuit Rule 46.5, we dismissed the appeal and remanded to the district court "for a determination of whether and in what amount attorney fees should be granted." Appellants' App., Tab 36.

While our order might have been clearer, certainly we did not intend to delegate to the district court the threshold decision of whether the requesting party had a right to sanctions in the first instance. Rather, having ourselves concluded that imposition of a sanction to pay attorney fees was warranted, we remanded to the district court to determine whether there were mitigating circumstances not apparent in the record before us, and whether any amounts claimed were reasonable in light of all factors. "[T]he determination of the right

to sanctions . . . for conduct during an appeal is reserved to the appellate court, although it may allow the trial court to fix the amount of the fees and costs." Morris by Rector v. Peterson, 871 F.2d 948, 951 (10th Cir. 1989) (citation omitted).

Following full briefing on remand, the district court found that the Note Partners were entitled to its reasonable attorney fees in the amount of $2,612.50. We find no error in the district court's determination.

## CONCLUSION

Therefore, for the reasons stated, we AFFIRM the district court's judgment.